## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| XNH OF DALLAS, INC. and Hc | § | |
| HEALTHCARE INVESTORS, INC., | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | No. _____ |
| | § | A03CA 934 Lyi |
| PRAIRIE EQUITIES, LTD. and LTC | § | |
| PROPERTIES, INC. | § | |
| **Defendants** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

NOW COMES XNH of Dallas, Inc. and Hc Healthcare Investors, Inc., and files this their Original Complaint against Defendants Prairie Equities, LTD and LTC Properties, Inc., and would respectfully show this Court as follows:

## I. PRELIMINARY STATEMENT

1.      This Complaint involves a dispute over the lease of a nursing facility located in Austin, Texas.  Plaintiff Hc Healthcare Investors, Inc. ("Hc Healthcare") currently operates the nursing facility pursuant to a sublease agreement.  Defendant Prairie Equities, LTD ("Prairie Equities") owns the nursing facility, and Defendant LTC Properties, Inc. ("LTC Properties") holds a mortgage on the nursing facility.  Defendant LTC Properties instructed Plaintiff Hc Healthcare to direct its lease payments to LTC Properties due to Prairie Equities' failure to make timely mortgage payments to LTC Properties.  Plaintiff Hc Healthcare brings this Complaint seeking relief by interpleader, asking that it be allowed to tender all future lease payments to the registry of the Court and for the Court to decide which defendant is entitled to these payments.  Plaintiff also seeks a declaratory judgment from this Court that the sublease and underlying lease

1

between Plaintiffs and Defendant Prairie Equities are valid and enforceable against Defendant Prairie Equities. Finally, Plaintiff Hc Healthcare seeks an order from this Court that Defendant Prairie Equities provide an accounting of the monthly payments that Hc Healthcare has made to it under the sublease, which monthly payments include amounts to be paid as estimated taxes on the nursing facility property.

## II. PARTIES AND SERVICE OF PROCESS

2.      Plaintiff, XNH of Dallas, Inc. ("XNH"), formerly known as Spring Season of Austin, Inc., is a corporation, organized and existing under the laws of the State of Texas.

3.      Plaintiff Hc Healthcare Investors, Inc. ("Hc Healthcare"), is a corporation, organized and existing under the laws of the State of Texas, doing business as Redstone Nursing and Rehab Center. Redstone Nursing and Rehab Center is a licensed nursing facility in the business of caring for elderly and infirm persons who require health care services and reside at the facility.

4.      Defendant Prairie Equities, LTD ("Prairie Equities") is a New Jersey limited partnership doing business in the State of Texas and may be served with process by delivering a copy of the summons and the complaint to its registered agent for service, Law Tech Service, Inc., One Riverway, Suite 1950, Houston, TX 77056.

5.      Defendant LTC Properties, Inc. ("LTC Properties") is a California corporation that may be served with process by delivering a copy of the summons and the complaint to an officer or agent at its place of business at 22917 Pacific Coast Highway, Suite 350, Malibu, CA 90265.

2

## II. JURISDICTION

6.     This Court has jurisdiction over this Complaint under 28 U.S.C. § 1332(a), as this case involves a controversy that exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.  This Court also has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1335, as this Complaint involves a civil action of interpleader by a party having in its possession money in the amount of $500 or more that is subject to two or more adverse claimants of diverse citizenship.

## III. VENUE

7.     Venue is proper in the United States Court for the Western District of Texas pursuant to 28 U.S.C. § 1391(b) as this action is founded on diversity of citizenship and a substantial part of the events given rise to the Complaint occurred in the Western District of Texas, and in addition the property that is the subject of this Complaint is situated in the Western District of Texas.

## IV. BACKGROUND

8.     On or about February 16, 2000, Defendant Prairie Equities, as landlord, and Plaintiff XNH of Dallas, Inc. f/k/a Spring Season of Austin, Inc. ("XNH"), as tenant, entered into that certain Lease (the "Lease"), pursuant to which XNH leased and took over the operation of Spring Season of Austin, a licensed nursing facility in Travis County, Texas now known as Redstone Nursing and Rehab Center (hereinafter referred to as the "Nursing Facility").  A true and correct copy of the Lease is attached hereto as Exhibit "A" and incorporated herein by reference.  In early 2003, XNH filed for bankruptcy protection under Chapter 11 of the United State Bankruptcy Code, and subsequently rejected the Lease as debtor in possession.  Pursuant to Section 365(g) of

the Bankruptcy Code, XNH's rejection of the Lease constituted a breach of the Lease by XNH.  However, Defendant Prairie Equities did not choose to terminate the Lease and thus the Lease remained in effect following its rejection.

9.      On or about February 1, 2003, Plaintiff XNH, as landlord, and Plaintiff Hc Healthcare, as tenant, entered into a Sublease Agreement (the "Sublease") pursuant to which Plaintiff Hc Healthcare took over the operation of the Nursing Facility and assumed all of the duties and obligations of the tenant under the Lease.  A true and correct copy of the Sublease is attached hereto as Exhibit "B" and incorporated by herein by reference.  Pursuant to the Sublease, Plaintiff Hc Healthcare agreed to make monthly lease payments to Defendant Prairie Equities in the amount provided for in the Lease.  In addition, pursuant to the Sublease and Lease Plaintiff Hc Healthcare agreed to make monthly payments to Defendant Prairie Equities in the amount of Defendant's estimated monthly tax assessments on the leased property.  From February 1, 2003 until October 1, 2003, Plaintiff Hc Healthcare timely made monthly payments in the amount of $26,267.17 to Defendant, which included rent for the Nursing Facility and estimated monthly tax payments.

10.      To finance its purchase of Nursing Facility, upon information and belief Defendant Prairie Equities had previously obtained a loan in the amount of $1,500.000.00 from Defendant LTC Properties on or about December 23, 1997, which loan is secured by a deed of trust to LTC Properties on the Nursing Facility.  On or about November 25, 2003, Plaintiff XNH received written notice from LTC Properties that Defendant Prairie Equities was in default of its obligations under its loan agreement with LTC Properties.  A true and correct copy of this notice is attached hereto as Exhibit "C" and incorporated

herein by reference for all purposes.  This notice instructed Plaintiff that all future payments under the Lease were to be made directly to LTC Properties.  Pursuant to this notice, Plaintiff Hc Healthcare made all lease payments for November and December 2003 directly to LTC Properties.

11.   By letter of November 26, 2003, a true and correct copy of which is attached hereto as Exhibit "D" and incorporated herein by reference, Defendant Prairie Equities has demanded that Plaintiff Hc Healthcare make all monthly lease payments to Defendant Prairie Equities.  In this letter, Defendant Prairie Equities indicated that the rejection of the Lease by Plaintiff XNH constituted a termination of the Lease, and contended that Plaintiff Hc Healthcare was operating the nursing facility pursuant to an oral lease agreement as opposed to the Sublease and the Lease.  In this letter, Defendant Prairie Equities stated that if the $26,627.17 monthly rental payment for November 2003 was not paid, it would terminate the oral lease and seek to recover possession of the Nursing Facility.

12.   On or about December 9, 2003, Defendant Prairie Equities filed a Complaint for Forcible Detainer against Plaintiff Hc Healthcare in Travis County Justice Court, Precinct No. 4, seeking to evict Plaintiff Hc Healthcare from the Nursing Facility. A true and correct copy of this Complaint for Forcible Detainer is attached as Exhibit "E" and incorporated herein by reference.

## V. CAUSE OF ACTION I:  INTERPLEADER

13.   Pursuant to 28 U.S.C. § 1335, Plaintiff files this civil action of interpleader against Defendants Prairie Equities and LTC Properties.  To establish that it is entitled to relief by interpleader, a party must show that it has in its custody or possession money or

property of the value of $500 or more, and (1) that two or more claimants of diverse

citizenship are claiming or may claim to be entitled to the money or property, and (2) that

it has deposited this money or property into the registry of the court.  28 U.S.C. § 1335.

Plaintiffs in this case meet all of the statutory elements entitling them to an interpleader

in this case.   Plaintiff Hc Healthcare is in possession of lease payments that both

Defendants Prairie Equities and LTC Properties are claiming the right to receive.

Plaintiff Hc Healthcare represents to that it is ready and willing to unconditionally

deposit with this Court all amounts due and owning under the Sublease and the Lease as

these amounts become due and owing.  The amount of $26,627.17 for January 2004 lease

payments is being deposited with this Court along with this petition.

14.     Plaintiffs request that this Court grant its petition in interpleader, and enter

an order that Plaintiffs shall tender all payments due under the Lease to the registry of the

Court as these payments become due under the Lease, and that Plaintiffs shall be

discharged from any further liability for these monthly payments under the Lease at the

time these payments are tendered to the registry of this Court.

## VI. CAUSE OF ACTION III:  DECLARATORY JUDGMENT

15.     Plaintiffs seek a declaratory judgment from this Court pursuant to 28

U.S.C. §2201 that the Lease is currently in full force and effect and that Plaintiff Hc

Healthcare is entitled to possession of the Nursing Facility premises under the Lease and

Sublease.  This declaratory judgment action is justiciable because an actual controversy

exists between Plaintiffs and Defendant Prairie Equities.  Defendant Prairie Equities has

stated that the Lease has terminated because of its rejection by Plaintiff XNH in its

Chapter 11 bankruptcy.  Defendant Prairie Equities has filed an eviction suit against

Plaintiff Hc Healthcare to recover possession of the Nursing Facility based on its erroneous contention that the Lease is no longer in effect. As such, this controversy is ripe for adjudication and thus justiciable.

### VII. <u>CAUSE OF ACTION II: PETITION FOR ACCOUNTING</u>

16.      Defendant has provided no accounting or break down of the amounts paid to it by Plaintiff Hc Healthcare under the Sublease and Lease. Currently, Plaintiff Hc Healthcare has no way of determining what portion of the $26,267.17 monthly payment was used for estimated taxes or how much in taxes have actually accrued on the property. An accounting of these transactions is necessary for Hc Healthcare to determine what amount it has paid to Defendant that must be applied to taxes, and to determine what amount of taxes have already accrued on the lease property. Hc Healthcare has no adequate remedy at law to determine the amount it has paid to Defendant for estimated taxes. For this reason, Plaintiff Hc Healthcare prays that this Court order Defendant Prairie Equities to provide a full accounting of the amounts it has been paid for estimated taxes under Lease and Sublease.

### VIII. <u>PRAYER</u>

WHEREFORE, Plaintiffs XNH and Hc Healthcare requests that Defendants be cited to appear and answer, and pray that this Court enter judgment in their favor as follows:

     a.      Order that Plaintiff Hc Healthcare shall deposit all payments due under the Sublease to the registry of the Court as these payments become due, and that Plaintiffs are discharged from any further liability for these monthly payments at the time these payments are deposited to the registry of this Court.

b.   Declare that the Lease and the Sublease are currently in full force and effect and that Plaintiff Hc Healthcare is entitled to possession of the Nursing Facility premises under the Lease and Sublease.

c.   Order Defendant Prairie Equities to provide a full accounting of the amounts it has been paid for estimated taxes under Lease and Sublease.

d.   Award Plaintiffs their costs, including reasonable attorneys' fees.

e.   Award Plaintiffs such other and further relief to which they may be entitled.

Respectfully Submitted,

ATWOOD & ASSOCIATES, L.L.P.
400 West 15th Street, Suite 700,
Austin, Texas 78701
(512) 472-9250
(512) 472-9280 (Telecopier)

By: _____
        Steve Dillawn
        State Bar No. 05871300

ATTORNEYS FOR PLAINTIFFS

# EXHIBIT "A"

LEASE
For
SPRING SEASON OF AUSTIN
3101 Govalle Avenue
Austin, Texas 77056


between


Prairie Equities, Ltd.
a New Jersey limited partnership

"Landlord"


and


Spring Season of Austin, Inc.
a Texas corporation

"Tenant"


Commencement Date:
As of
February 16 , 2000

TABLE OF CONTENTS

ARTICLE 1   DEFINITIONS                                              1
ARTICLE 2   DESCRIPTION                                             3
ARTICLE 3   TERM                                                    3
ARTICLE 4   WARRANTIES                                              3
ARTICLE 5   RENT                                                    4
ARTICLE 6   IMPROVEMENTS                                            7
ARTICLE 7   TAXES AND ASSESSMENTS                                   7
ARTICLE 8   USE                                                     9
ARTICLE 9   MAINTENANCE                                            12
ARTICLE 10  ALTERATIONS                                            13
ARTICLE 11  MECHANIC'S LIENS                                       14
ARTICLE 12  UTILITIES AND SERVICES                                 14
ARTICLE 13  INDEMNITY AND EXCULPATION                              15
ARTICLE 14  INSURANCE                                              16
ARTICLE 15  CONDEMNATION                                           19
ARTICLE 16  DESTRUCTION                                            21
ARTICLE 17  ASSIGNMENT AND SUBLETTING                              25
ARTICLE 18  DEFAULTS; REMEDIES                                     28
ARTICLE 19  SIGNS                                                  31
ARTICLE 20  RIGHT OF ENTRY                                         32
ARTICLE 21  SUBORDINATION; ESTOPPEL; CERTIFICATION                 32
ARTICLE 22  WAIVER                                                 33
ARTICLE 23  SALE OR TRANSFER OF PREMISES                           34
ARTICLE 24  FINANCIAL STATEMENTS/OPERATING INFORMATION             34
ARTICLE 25  LICENSING                                              35
ARTICLE 26  SURRENDER OF PREMISES; HOLDING OVER                    35
ARTICLE 27  PRESERVATION OF PATIENT RECORDS                        36
ARTICLE 28  PATIENT CARE; CENSUS                                   36
ARTICLE 29  MISCELLANEOUS                                          36

# LEASE

Nursing home

This lease ("Lease") is entered into as of February 16, 2000 between Prairie Equities, Ltd. a New Jersey limited partnership ("Landlord") and Spring Season of Austin, Inc., a Texas corporation ("Tenant"), with reference to the following facts:

I.      Landlord owns the premises hereinafter described, together with the furniture, fixtures and equipment therein.

II.     Tenant is experienced in the management and operation of healthcare facilities.

III.    Tenant desires to lease the premises and the furniture, fixtures, and equipment therein from Landlord pursuant to the provisions of this Lease, for the purpose of operating a skilled care nursing facility.

IV.     Landlord is entering into this Lease in reliance upon the particular skills, knowledge and experience of Tenant in the operation of healthcare facilities.

THE PARTIES AGREE AS FOLLOWS:

## ARTICLE 1
## DEFINITIONS

As used in this Lease, the following words and phrases shall have the following meanings:

1.1     "Alteration" - any addition, change or modification, structural and nonstructural to the Premises (as such term is defined in Section 2.1 below) made by Tenant including, without limitation, fixtures, but excluding Tenant's personal property.

1.2     "Authorized Representative" - any officer, agent, employee or independent contractor retained or employed by either party, acting within authority, actual or apparent, given him by that party.

1.3     "Encumbrance" - any land sale contract, deed of trust, mortgage, or other written security device or agreement affecting the Premises and/or Personal Property (as such term is defined in Section 2. 1 below), and the note or other obligation secured by it, that constitutes security for the payment of a debt or performance of an obligation.

1.4     "Hazardous Substances" - as defined in Section 8.2.6 of this Lease.

1

1.5    "Hold harmless" - to defend and indemnify from all liability, losses, penalties, damages, costs, expenses (including, without limitation, attorneys' fees), causes of action, claims, or judgments arising out of or related to any damage to any person or property.

1.6    "Landlord" - Prairie Equities, Ltd. a New Jersey limited partnership, its Successors (as defined in Section 1.12 below), and any person or entity succeeding to the rights of Landlord by reason of an ownership interest or a security interest in the Facility (as defined in Section 2.1 below) including, without limitation, any Lender (as defined in Section 1.9 below) of Landlord.

1.7    "Law" - any judicial decision, statute, constitution, ordinance, resolution, regulation, rule, administrative order, or other requirement of any municipal, county, state, federal, or other government agency or authority having jurisdiction over the parties or the Facility, or both, in effect whether at the time of execution of the Lease or at any time during the term, including, without limitation, any regulation or order of a quasi-official entity or body, including any Medicare or Medicaid fiscal intermediary.

1.8    "Lease Year" - the twelve-month period commencing on the Commencement Date (as defined in Section 3.1 below) and on each succeeding anniversary of the Commencement Date during the term (and any extended term) of the Lease.

1.9    "Lender" - a beneficiary, mortgagee, secured party, or other holder of an Encumbrance on the Facility or any part thereof.

1.10   "Rent" - Base Monthly Rent (as hereinafter defined), additional rent, late fees, security deposit, utility charges, real and personal property taxes and assessments, insurance premiums, and all other charges payable by Tenant to Landlord or any third person pursuant to the provisions of this Lease.

1.11   "Restoration" - the reconstruction, rebuilding, rehabilitation and repairs that are necessary to return damaged or destroyed portions of the Facility and other property to substantially the same physical condition as they were in immediately before the damage or destruction.

1.12   "Successor" - any assignee, transferee, personal representative, heir, or other person or entity succeeding lawfully, and pursuant to the provisions of this Lease, to the rights and obligations of either party.

1.13   "Tenant's Improvements" - any addition to or modification of the Premises made by Tenant during the term, including, without limitation, fixtures installed by Tenant, but excluding replacement of the furniture, fixtures and equipment leased to Tenant under this Lease.

## ARTICLE 2
## DESCRIPTION

2.1     Subject to the terms and conditions contained herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the real property located at 3101 Govalle Avenue, Austin, Texas 77056 and more fully described in Exhibit A attached hereto, together with all improvements now or hereafter located thereon, commonly known as Spring Season of Austin (the "Premises") and that certain personal property (furniture, fixtures, equipment and inventory) located or hereafter located in the Premises and described in Exhibit B attached hereto and any replacements thereof (the "Personal Property"). The Premises and Personal Property are sometimes hereinafter collectively referred to as the "Facility."

2.2     Landlord is informed that the Facility is presently licensed by the State of Texas to operate at least 83 skilled care beds and is certified and participates as a provider under Medicare and Medicaid legislation and regulations. Reference hereinafter to the "Licensed Facility" shall mean the Facility as so licensed and certified.

## ARTICLE 3
## TERM

3.1     The term of this Lease shall commence as of February 16th, 2000 ("Commencement Date") and shall terminate at midnight on August 31, 2022.

## ARTICLE 4
## WARRANTIES

4.1     LANDLORD HAS MADE NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, NOR DOES LANDLORD MAKE ANY HEREIN REGARDING THE CONDITION OF THE FACILITY OR ANY PART THEREOF INCLUDING WITHOUT LIMITATION THE STRUCTURAL SOUNDNESS THEREOF, THE PRESENCE OR ABSENCE OF HAZARDOUS SUBSTANCES OR THE FACILITY'S FITNESS FOR ANY PARTICULAR USE OR OCCUPANCY. LANDLORD SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS AND/OR WARRANTIES WITH RESPECT TO THE VACATION OF THE FACILITY BY THE PRIOR OPERATOR (AS DEFINED BELOW). LANDLORD FURTHER HEREBY SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS AND/OR WARRANTIES, BOTH EXPRESS AND IMPLIED IN LAW, WITH RESPECT TO THE CONDITION, HABITABILITY, OR SUITABILITY OF THE FACILITY, OR ANY PART THEREOF, FOR THE USE AND PURPOSES PERMITTED HEREUNDER OR ANY OTHER PURPOSE, AND LANDLORD DOES NOT REPRESENT OR WARRANT THAT THE FACILITY OR ANY PART THEREOF COMPLIES WITH ANY LAWS RELATING TO THE USES AND OCCUPANCY THEREOF. TENANT FULLY UNDERSTANDS THAT THERE MAY BE CERTAIN ALTERATIONS, REPAIRS AND REPLACEMENTS REQUIRED TO CAUSE THE FACILITY TO COMPLY WITH APPLICABLE LAW (AS THE SAME MAY BE MODIFIED FROM TIME TO

3

TIME THROUGHOUT THE TERM HEREOF) AND FOR THE CONTINUED LICENSING AND/OR CERTIFICATION OF THE FACILITY, AND TENANT SHALL BE FULLY RESPONSIBLE FOR THE COST OF AND FOR EFFECTUATING ANY AND ALL ALTERATIONS, REPAIRS AND REPLACEMENTS REQUIRED TO BE MADE TO CAUSE THE FACILITY TO COMPLY WITH APPLICABLE LAW AND FOR THE CONTINUED LICENSING AND CERTIFICATION OF THE FACILITY AS WELL AS ALL ALTERATIONS, REPAIRS AND REPLACEMENTS REQUIRED TO MAINTAIN AND PRESERVE THE FACILITY IN THE CONDITION CALLED FOR HEREIN.  TENANT ACKNOWLEDGES THAT LANDLORD IS NOT RESPONSIBLE FOR AND TENANT SHALL HOLD LANDLORD HARMLESS IN CONNECTION WITH ANY SUCH ALTERATIONS, REPAIRS AND REPLACEMENTS TO THE FACILITY FOR ANY REASON WHATSOEVER.

Initials of Tenant:

## ARTICLE 5
## RENT

5.1    Tenant shall pay to Landlord a monthly rent ("Base Monthly Rent") during each month of the term hereof, without deduction, setoff, prior notice or demand.  Base Monthly Rent at the commencement of this Lease (sometimes referred to herein as "Initial Base Monthly Rent") is $17,992.96 and is subject to increase as set forth below.

5.2    Base Monthly Rent shall be paid in advance on the first day of each month commencing with the month in which the term of this Lease commences.  If the Commencement Date is on a day other than the first day of a month, Base Monthly Rent for such partial month shall be prorated at the rate of 1/30th of the Base Monthly Rent per day.

5.3    All Rent shall be paid to Landlord in care of Barry Lieberman, Esq., P.O. Box 7718, Wilton, Connecticut 06897 or at such other address as may be designated by Landlord from time to time in writing to Tenant.  Rent not paid when due shall bear interest from the date due until paid at the maximum rate permitted by law, or if no maximum rate is applicable, at the rate of 18% per annum.

5.4    Tenant acknowledges that late payment of Rent will cause Landlord to incur damages and costs not contemplated by this Lease, the exact amount of which would be extremely difficult and impracticable to ascertain.  Such costs include, without limitation, processing and accounting charges, administrative costs ' loss of use of funds and late charges that may be imposed on Landlord by the terms of any Encumbrance.  Therefore, if any installment of Rent is not received by Landlord within ten (10) days after its due date, Tenant shall pay to Landlord an additional sum equal to five percent (5%) of the overdue Rent as a late charge, unless applicable law requires a lesser late charge, in which case Tenant shall pay the maximum late charge permitted by law.  The parties agree that this late charge represents a fair and reasonable estimate of the additional costs

4

that Landlord will incur by reason of late payment by Tenant. Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amount, nor prevent Landlord from exercising any of the other rights and remedies available to Landlord hereunder, at law or in equity.

5.5   Tenant hereby agrees that if Tenant fails to pay Rent or any other sum required to be paid by Tenant hereunder within the ten-day grace period for any two (2) consecutive months, or for any three (3) months during a Lease Year Rent hereunder for the remaining term of the Lease shall be automatically adjusted to be quarterly rental, payable in advance, commencing on the first day of the month following such consecutive late month, or the third late month in a Lease Year quarter, and continuing thereafter for the remaining term of the Lease on a quarterly basis in advance. Time is strictly of the essence with respect to the provisions of this Article.

5.6   Base Monthly Rent provided in this Lease, as the same may be increased pursuant to the terms hereof, shall be in addition to all other payments to be made by Tenant as provided herein. It is the purpose and intent of Landlord and Tenant that the Base Monthly Rent provided herein shall be absolutely net to Landlord so that this Lease shall yield net to Landlord the Base Monthly Rent specified in this Lease in each month during the term of this Lease and, except as otherwise specifically provided herein, Landlord shall have no obligation or liability to pay any amounts in connection with the ownership, operation and/or management of the Facility or any part thereof, including but not limited to real and personal property taxes, insurance premiums, maintenance, including but not limited to structural or exterior maintenance, license fees, and any costs incurred by Landlord or for which Landlord is responsible by virtue of the existence of any financing on the Facility (including but not limited to any tax imposed on a Lender by reason of its having made a loan to Landlord but not including points, fees, or other costs incurred in making a new loan or refinancing an existing loan), of any kind or nature whatsoever. Excluding Encumbrances for which Landlord is liable, all costs and expenses including, without limitation, taxes, assessments, insurance premiums, maintenance, license fees and obligations of every kind and nature whatsoever relating to the use and/or management of the Facility by Tenant which may accrue or become due during or out of the term or any renewal thereof shall be paid by Tenant and Landlord shall be indemnified and held harmless by Tenant from and against the same.

5.7   The Base Monthly Rent shall be increased as follows:

5.7.1   For purposes of this section, the "Initial Rent Adjustment Date" is defined as 2001.

5.7.2   On the Initial Rent Adjustment Date and each anniversary of the Initial Rent Adjustment Date for the year 2001, Base Monthly Rent shall increase by an amount equal to two percent (2%) of the Base Monthly Rent in effect for the then immediately preceding month as the same may have been adjusted pursuant to this Section 5.7.2 and Section 5.7.3. On the anniversary of the Initial Rent Adjustment date for the years 2002, 2003, 2004, 2005 and 2006, Base Monthly Rent shall increase by an amount equal to two

and one half percent (2 1/2%) of the Base Monthly Rent in effect for the then immediately preceding month as the same may have been adjusted pursuant to this Section 5.7.2 and Section 5.7.3. On the anniversary of the Initial Rent Adjustment Date for the year 2007 and on each anniversary thereafter during the term of the Lease, Base Monthly Rent shall increase by an amount equal to three percent (3%) of the Base Monthly Rent in effect for the then immediately preceding month as the same may have been adjusted pursuant to this Section 5.7.2 and Section 5.7.3.

5.7.3    The parties agree that the Initial Base Monthly Rent has been determined by taking into account the number of beds ("Licensed Beds") for which the Facility is licensed as of the date of this Lease. If and so often as the number of Licensed Beds increases during the term of this Lease, then, effective as of the date of each such increase, (i) then current Base Monthly Rent (as the same nay have previously increased under this Lease, whether as the result of any prior increase in Licensed Beds or otherwise) shall be increased by a percentage equal to such percentage increase in Licensed Beds, and (ii) for purposes of determining the annual increase in Base Monthly Rent in accordance with Section' 5.7.2 above, the Base Monthly Rent as adjusted pursuant to this Section shall be deemed the Base Monthly Rent for the immediately preceding month. In no event shall Base Monthly Rent decrease as the result of a decrease in the number of Licensed Beds. The increases in Base Monthly Rent contemplated by this Section 5.7.3 shall be in addition to and not in lieu of the increases contemplated by Section 5.7.2 above.

5.7.4    Tenant acknowledges that the Initial Base Monthly Rent has been determined by taking into account, among other factors, the aggregate monthly principal and interest ("Base Monthly Debt Service") intended to be payable by Landlord to its Lender. A financing is contemplated subsequent to the execution of this lease (the "Senior Debt"), in an account not less than $1,500,000. As a material inducement to Landlord to enter into this Lease upon the terms and conditions hereof, Tenant agrees that it shall pay, each month, as additional rent hereunder together with the installment of Base Monthly Rent for such month, the amount by which the aggregate monthly principal and interest payable by Landlord on account of the Senior Debt for such month ("Actual Monthly Debt Service") exceeds the Base Monthly Debt Service. In no event shall Base Monthly Rent decrease as a result of any decrease in Actual Monthly Debt Service below Base Monthly Debt Service.

5.8    It is expressly provided and stipulated that notwithstanding any provision of this Lease, in no event shall the aggregate of all interest paid or contracted to be paid to Landlord by Tenant (or any subtenant, guarantor, or assignee), ever exceed the maximum rate of interest which may lawfully be charged on any Rent owing under this Lease. It is expressly stipulated and agreed that it is the intent of Landlord and Tenant in the execution and delivery of this Lease to contract in strict compliance with applicable usury laws.

## ARTICLE 6
## IMPROVEMENTS

6.1     Tenant shall be responsible for improvements to the property as needed to keep it in compliance with all standards required by any government or agency concerning itself with skilled care facilities. The facility, and all work done, shall be of high quality and in excellent condition and state of repair.

## ARTICLE 7
## TAXES AND ASSESSMENTS

7.1     Tenant shall be responsible for the payment of all taxes, assessments, license fees, and other charges ("Personal Property Taxes") that are levied and assessed against all personal property, including but not limited to leasehold improvements, furniture, fixtures and equipment installed, whether by Landlord or Tenant, or located in or about the Premises, which taxes accrue during the term, regardless of when the same may be payable.

7.2     Tenant shall be responsible for the payment of all real property taxes, assessments and levies, both general and special ("Real Property Taxes") which are or are hereafter levied, assessed, or are otherwise imposed, against the Premises from January 1, 1997 until the Commencement Date, and thereafter during the term, regardless of when the same may be payable.

7.3     Tenant shall pay to Landlord (or to Landlord's Lender, as Landlord may direct), together with and in addition to the monthly payments of rental and other payments payable under the terms of this Lease, on the dates set forth herein for the making of monthly rental payments, until the end of the term of the Lease, a sum, as estimated by Landlord, equal to the Personal Property Taxes and Real Property Taxes (collectively "Taxes") next due on the Facility and any personal property located therein divided by the number of months to elapse before one month prior to the date when such Taxes will become delinquent, such sums to be held by Landlord to pay such Taxes. Such payments, hereinafter referred to as "Reserves", are to be held without any allowance of interest or dividend to Tenant and need not be kept separate and apart from other funds of Landlord. Tenant's payment of Reserves shall include an amount sufficient to pay all taxes accruing during the term of the Lease. All payments mentioned in this Section and all payments to be made under the Lease shall be added together and the aggregate amount thereof shall be paid by Tenant each month in a single payment. The arrangement provided for in this Section is solely for the added protection of Landlord and entails no responsibility on Landlord's part beyond the allowing of due credit, without interest, for the sums actually received by it. Upon assignment of the Lease by

Landlord, any funds on hand shall be turned over to the Successor and any responsibility of the assignor with respect thereto shall terminate. If the total of the Reserves hereof shall exceed the amount of payments actually applied by Landlord, such excess may be credited by Landlord on subsequent payments to be made by Tenant or, at the option of Landlord, refunded to Tenant or its Successors. If, however, the Reserves shall not be sufficient to pay the sums required when the same shall become due and payable, Tenant shall immediately deposit with Landlord the full amount of any such deficiency. If there shall be a default under any of the provisions of this Lease, Landlord may use, apply or retain, to cure such default and to compensate Landlord for all damage sustained by Landlord as a result of such default, at any time, all or any part of the Reserves held by Landlord, and upon demand of Landlord, Tenant shall immediately deposit with Landlord a sum equal to the portion of the Reserves so used, applied or retained by Landlord. If there shall be a default under any of the provisions of this Lease, Landlord may apply, at any time, the balance then remaining in the funds accumulated under this Section 7.3, less such sums as will become due and payable for the upcoming tax liability, against the amounts due and payable under the Lease.

7.4     Tenant's liability to pay Taxes shall be prorated on the basis of a 365-day year to account for any fractional portion of a tax year included in the term at its commencement and expiration. Prorations shall be based on assessments and Tenant shall pay such prorations when the prorated tax installment becomes due.

7.5     Tenant shall have the right to contest or review by legal proceeding, or in such other manner as it may deem suitable (which, if instituted, Tenant shall conduct promptly at its own expense, and free of any expense to Landlord, and if necessary, in the name of Landlord) any Taxes. Tenant may defer payment of a contested item upon condition that, before instituting any such proceeding, Tenant shall furnish to Landlord, or to any Lender Landlord may designate, security reasonably satisfactory to Landlord and such Lender sufficient to cover the amount of any Taxes. Notwithstanding the furnishing of any such security, Tenant shall promptly pay such contested item if at any time the Facility or any part thereof shall be in danger of being sold or forfeited. The legal proceeding herein referred to shall include an appropriate proceeding to review tax assessments and appeals from any judgment, decree, or order in connection therewith, but such proceeding shall be commenced as soon as possible after the assessment of any contested item and shall be prosecuted to final adjudication with dispatch. If there shall be any refund with respect to any contested item based on a payment by Tenant, Tenant shall be entitled to such refund to the extent of such payment.

7.6     Tenant shall, in addition to all other sums, pay all fees for inspection and examination of the Facility during the term hereof which are charged by any public authority having jurisdiction therein.

7.7     Tenant shall not be required to pay any municipal, county, state, or federal income or franchise taxes or Landlord, or any municipal, county, state, or federal estate, succession, inheritance, or (except as provided below) transfer taxes of Landlord. If at any time during the term, the State in which the Facility is located or any political

subdivision of such State, including any county, city, public corporation, district, or any other political entity or public corporation of such State, levies or assesses against Landlord a tax, fee, or excise on (1) rents, (2) the square footage of the Premises, (3) the act of entering into this Lease, or (4) the occupancy of Tenant, or levies or assesses against Landlord any other tax, fee, or excise, however described, including, without limitation, a so-called value added tax, as a direct substitution in whole or in part f or, or in addition to, any Real Property Taxes, Tenant shall pay before delinquency that tax, fee, or excise. Notwithstanding the above, if a transfer tax is payable to any governmental agency or agencies as a result of this Lease, Tenant shall, to the extent permitted by law, pay the same directly to the taxing authority or authorities when it is due, or at Landlord's election, Tenant shall pay same to Landlord within ten (10) days after notice to Tenant from Landlord, and in such event, Landlord shall pay the tax following receipt from Tenant.

## ARTICLE 8
## USE

8.1    Tenant shall use the Facility for a licensed skilled care nursing facility and for no other use without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion.

8.2    Tenant's use of the Facility as provided in this Lease shall be in accordance with the following:

8.2.1   Tenant shall not do, bring, or keep, or permit to be done, brought or kept, anything in, on or about the Premises that may cause an invalidation or cancellation of any insurance covering the Facility, and Tenant shall comply with all requirements imposed by any company issuing such insurance.

8.2.2   Tenant shall cause the Facility to be and remain licensed and certified by the applicable state and/or local governmental agencies as the Licensed Facility, and shall maintain such license(s) and certifications during the term of this Lease. At Tenant's sole expense, Tenant shall cause the Facility to conform to the requirements and provisions of all applicable laws concerning the use of the Facility as so licensed including, without limitation, the obligation at Tenant's sole cost and expense to alter, maintain, replace or restore the Facility or any part thereof in compliance and conformity with all laws relating to the condition, use or occupancy of the Facility as licensed. Tenant shall deliver to Landlord, promptly following receipt thereof, copies of all inspection reports respecting the Facility issued during the term hereof by any and all governmental agencies which conduct inspections thereof.

8.2.3   Tenant shall not use (i) the Facility in any manner that will constitute a nuisance, (ii) cause or allow to be caused waste to the Facility, or (iii) cause unreasonable annoyance to owners or occupants of adjacent properties.

8.2.4   Tenant shall not do or permit to be done anything on the Premises that will cause damage to the Facility or any part thereof.  The Premises shall not be overloaded with furniture, equipment or machinery in such manner that damage is caused to the Premises or any part thereof.  No machinery, apparatus or ' other appliance shall be used or operated in, on or about the Premises that will in any manner injure the Facility or any part thereof.

8.2.5   Tenant shall pay all payrolls, promptly when due respecting all personnel at the Facility, and shall file all governmental reports required pursuant thereto (including, without limitation, payroll tax returns) and shall pay such taxes promptly and before delinquency.

8.2.6(a)       Tenant shall not bring, release, use, generate, manufacture, store or dispose of, or permit to be brought, released, used, generated, manufactured, stored or disposed of, on, under or about the Facility, or transfer or permit to be transferred to or from the Facility, any asbestos, asbestos containing materials, flammable explosives, radioactive materials, hazardous wastes, toxic substances or related materials (collectively "Hazardous Substances"). There is excluded from this prohibition Hazardous Substances of the type commonly used in nursing homes in the State in which the Facility is located, subject to the condition that they are used, stored and disposed of in accordance with all applicable Law.  As used in this Lease, Hazardous Substances shall include, but not be limited to, substances defined as "hazardous substances", "hazardous materials", or "toxic substances" in the comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq.; the Clean Water Act, 33 U.S.C. Section 466 et seq.; the Safe Drinking Water Act, 14 U.S.C. Section 1401 et seq.; the Superfund Amendment and Reauthorization Act of 1986, Public Law 99-499, 100 State. 1613; the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., as amended; and those materials and substances of a similar nature regulated or restricted under any other laws now existing or hereafter adopted, and in regulations adopted and publications promulgated pursuant to said laws, and under all applicable Law in the State of Texas.

(b)      If Tenant knows, or has reasonable cause to believe, that a Hazardous substance, or a condition involving or relating to the same, has come to be located in, on or about the Facility, other than as previously consented to by Landlord, Tenant shall immediately give written notice of such fact to Landlord.

(c)      Tenant shall, at its sole cost and expense, promptly take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the clean-up of any contamination of, and for the maintenance, security and or monitoring of, the Facility, the elements surrounding the same, or neighboring properties, that was caused or materially contributed to by Tenant, relating to or involving any Hazardous Substances brought onto and/or released from the Facility.

(d)    Tenant shall indemnify, protect, defend and hold Landlord, its agents, employees, partners (including, in the case of a corporate partner, such corporation's shareholders, officers and directors) and Lenders, and the Facility, harmless from and against any and all damages, liabilities, judgments, costs, claims, liens, expenses, penalties and attorneys' and consultants' fees arising out of or involving (i) any Hazardous Substances presently existing or brought onto and/or released or threatened to be released from or onto the Facility by any person during the term of the Lease and/or (ii) Tenant's failure to perform any of its obligations under this Section 8.2.6. Tenant's obligations hereunder shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Tenant, and the cost of investigation, removal, remediation, restoration and/or abatement thereof, or of any contamination therein involved, and shall survive the expiration or earlier termination of this Lease.  No termination, cancellation or release agreement entered into by Landlord and Tenant shall release Tenant from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Landlord in writing at the time of such agreement.

8.2.7   Tenant shall comply with, and the leasehold created by this Lease is subject to, all covenants, conditions, restrictions, easements and rights of way affecting the Premises.

8.3    Concurrently with commencement of the term, Landlord is terminating any and all prior leases concerning the Facility.  The Facility has been operated by the prior tenant ("Prior Operator"). Tenant agrees that it will arrange for the following at or prior to the commencement of the term:

8.3.1   Tenant shall arrange for, or acquire from the Prior Operator, all inventory of food, drugs, laundry supplies, and other supplies for the Facility-

8.3.2   Tenant shall post new utility deposits or purchase Prior Operator's deposits, as may be required.

8.3.3   Tenant shall adjust and prorate directly with Prior Operator and all third parties all matters dealing with patient accounts and operating expenses and shall hold harmless Landlord from and against all matters pertaining thereto.

8.3.4   Tenant shall assume the contracts and/or equipment leases relating to the Facility.

8.3.5   Tenant shall take a physical inventory of the furniture, fixtures and equipment prior to commencement of the term, and report any shortages or discrepancies to Landlord immediately.   Failure to report shortages or discrepancies prior to commencement of the term shall constitute a waiver by Tenant of any shortages or discrepancies in furniture, fixtures and equipment.

8.3.6   Tenant shall furnish to Landlord promptly upon receipt by Tenant, copies of all licenses, surveys and inspection reports relating to the Facility, together with copies of all correspondence sent or received by Tenant from any and all regulatory authorities having

11

cognizance or authority over operation at the Facility, including but not limited to the Department of Health Services and the agencies regulating Medicare and Medicaid certification of the Facility, and its reimbursement and/or provider programs. Tenant shall also furnish to Landlord copies of all plans of correction submitted to any such agency concurrently with such submission. Tenant shall notify Landlord immediately each time a survey or inspection of the Facility is commenced by any regulatory body or authority. Tenant shall furnish Landlord with copies of monthly and year-end operating results, and balance sheets.

8.3.7    Tenant shall arrange with Prior operator for the transfer of patients' trust funds and the accounting thereof, and shall furnish any bond, which may be required by law in connection therewith. Tenant shall hold harmless Landlord from and against any and all liabilities, losses, damages, costs, expenses (including, without limitation attorneys' fees and costs), causes of action, claims, or judgments arising out of or related to the transfer of Any patients' trust funds and the accounting thereof.

ARTICLE 9
MAINTENANCE

9.1    Tenant shall, at its sole cost and expense, at all times during the term of this Lease, maintain the Premises and every part thereof in good, clean working order, condition and repair including, without limitation, the structural portions of the building and improvements thereon, the interior and exterior thereof, foundations, roofs, plate glass, wiring, plumbing, heat and air conditioning units, mechanical systems, parking and service areas, landscaping, the approaches thereto and appurtenances thereof, including all adjacent sidewalks and alleys. Tenant's obligation to maintain the Premises shall specifically include, without limitation, the obligation to make any and all repairs and to repaint and/or restain all painted and wood surfaces and re-stripe the parking areas as required. Landlord shall not have any responsibility to maintain the Premises or any part thereof including, without limitation, any structural or mechanical maintenance, repair or replacement. Tenant waives all rights under any laws, which may provide for Tenant's right to make repairs and deduct the expenses of such repairs from rent or to withhold rent or terminate the Lease based upon the condition of the Premises.

9.2    Tenant shall, at its sole cost and expense, at all times during the term of this Lease, keep and maintain all the Personal Property including furniture, fixtures and equipment, in good working order, condition and repair. Tenant shall have the right to install on the Premises any and all equipment and fixtures, which Tenant desires to install thereon and which are necessary or convenient to Tenant's use of the Premises as permitted herein, without the consent of Landlord. All such property so installed by Tenant shall remain Tenant's property (other than replacements for Personal Property as provided below) and, provided Tenant is not in default hereunder, nay be removed by Tenant as provided in this Lease. Except as provided below, Tenant shall not remove the Personal Property described in Exhibit B, and/or replacements thereof or any part thereof from the Premises, without the prior written consent of Landlord. Tenant shall purchase and replace with substitutes of equal or higher quality any worn out or broken items of

Personal Property required to be on the Premises for continued licensing and/or certification as the same may occur from time to time throughout the term of this Lease at Tenant's sole cost and expense. Items being replaced by Tenant may be removed without Landlord's prior consent and shall become the property of Tenant, and items replacing same shall be and remain the property of Landlord subject to removal only with Landlord's consent until in turn replaced. Tenant agrees, upon written request from Landlord, to execute any and all documents necessary to assist Landlord to fully evidence Landlord's ownership of the Personal Property.

9.3    Tenant shall, throughout the term of this Lease, make all repairs, alterations, replacements and additions to the Facility required by law and/or as necessary to obtain and maintain licensing and certification as the Licensed Facility.

9.4    If any Lender requires the imposition of a replacement reserve, or similar reserve for purposes of maintaining the Facility or portions thereof, by requiring monthly or other such periodic payments to an escrow account for such purposes, Tenant, on notice from Landlord indicating this requirement, shall make such payments in accordance with the Lender's requirements.

## ARTICLE 10
## ALTERATIONS

10.1    Other than as indicated herein, Tenant shall not make or allow to be made any Alterations to the Premises or any part thereof in excess of Twenty Five Thousand Dollars ($25,000.00) during any Lease Year without Landlord's prior written consent. Any Alterations made shall remain on and be surrendered with the Premises on expiration or termination of the term. Failure of Landlord to respond within ten (10) days after Tenant notifies Landlord of its request for Landlord's consent to Alterations shall be deemed consent. Landlord's consent shall not be necessary for emergency repairs, or Alterations required for continued licensing and/or certification of the Facility, unless the Premises would diminish in value.

10.2    Except in the event of an emergency Alteration, if Tenant makes any Alterations to the Premises as provided in this Article, the Alterations shall not be commenced until at least ten (10) days after Landlord has received notice from Tenant stating the date the installation of the Alterations is to commence, if any structural modifications are to be made, then to the extent applicable, the provisions of Sections 16.9 and 16.10 shall apply to any requested Alterations as if the Alteration project was a Restoration. Landlord may impose such further conditions to its consent, as it deems reasonably necessary, including the posting of bonds or financial security that, in the Landlord's absolute discretion will insure the total completion of any work. Tenant shall pay all Landlord costs, including attorneys fees, to evaluate the request.

13

## ARTICLE 11
## MECHANIC'S LIENS

11.1    Tenant shall pay, when due, all costs for construction done by it or caused to be done by it on the Premises.  Tenant shall keep the Premises free and clear of all mechanic's liens and other liens by reason of work, labor, services or materials supplied or claimed to have been supplied to or for Tenant, or anyone holding the Premises or any part thereof through or under Tenant.

11.2    If Tenant shall, in good faith, contest the validity of any such lien, then Tenant shall, at its sole cost and expense, indemnify, defend and hold harmless Landlord, its agents, employees, partners (including, in the case of a corporate partner', such corporation's shareholders, officers and directors) and Lenders, and the Facility against the same and shall pay and satisfy any adverse judgment that may be rendered thereon before the enforcement thereof against such parties or the Facility.  Tenant shall furnish to Landlord a surety bond satisfactory to Landlord in an amount equal to one and one-half times the amount of the contested lien, indemnifying Landlord against liability for the same, as required by law for the holding of the Facility free from the effect of such lien or claim, or such other reasonable security as may be required by Landlord or its Lender.  In addition, Landlord may require Tenant to pay Landlord's attorneys' fees and costs in participating in such action if Landlord shall decide it is in its best interest to do so.

11.3    If Tenant shall fail to discharge any such lien within ten (10) days of its being filed or fails to furnish reasonable security therefor as may be required by Landlord or Landlord's Lender, then, in addition to any other right or remedy of Landlord resulting from Tenant's said default, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by giving security or in such other manner as is or may be prescribed by law or practice of the state in which the Facility is located.  Tenant shall repay to Landlord, as additional rent, on demand, all sums disbursed or deposited by Landlord pursuant to the foregoing provisions of this section plus interest thereon at the then maximum rate of interest permitted by law, or if no maximum rate then applies, at the rate of 18% per annum.  Nothing contained herein shall imply any consent or agreement on the part of Landlord to subject Landlord's estate to liability under any mechanic's or other lien law.

## ARTICLE 12
## UTILITIES AND SERVICES

12.1    Tenant shall make all arrangements for, and prior to delinquency pay for, all utilities and services furnished to the Facility or used by it, including, without limitation,

gas, electricity, water, telephone service, and trash collection, and for all connection charges and deposits required by any of said utilities. Landlord shall not be liable for any interruption in the provision of any such utility services to the Facility.

## ARTICLE 13
### INDEMNITY AND EXCULPATION

13.1    Tenant hereby agrees to defend, indemnify and hold harmless Landlord, its partners (including the shareholders, officers and directors of any corporate partner), agents, employees, successors and Lenders (the "Landlord Group") and the Facility from each and every claim, demand, lien, loss, penalty, cost (including attorneys' fees and costs of litigation), judgment and damage of any kind or nature whatsoever at any time made by reason of any injury or death to any person or persons, including Tenant, or damage or destruction to property of any kind whatsoever and to whomsoever belonging including, without limitation, Tenant, from any cause or causes, (including without limitation Tenant's arranging or failure to arrange for competent medical care, or to render competent dietary and sanitary care, to patients and occupants) , resulting from or directly or indirectly arising out of Tenant's possession, occupancy, maintenance, repair and/or use of the Facility, the conduct of Tenant's business at the Facility, any act, omission or neglect of Tenant, its agents, contractors, employees or invitees, any default or breach by Tenant in the performance of its obligations hereunder, or the condition, use or misuse of the Facility and the approaches and appurtenances thereto, including, without limitation, all adjacent sidewalks, alleys, and the parking area.  The foregoing shall include without limitation the defense or pursuit of any claim or any action or proceeding involved therein, and whether or not (in the case of claims made against Landlord) litigated and/or reduced to judgment, and whether well founded or not. Excluded from Tenant's obligations set forth in this section are damages which are the sole, direct and proximate result of Landlord's gross negligence, willful acts or omissions, or Landlord's material breach of this Lease, except to the extent that insurance coverage for Landlord's protection is required by the provisions of Article 14.

13.2    Tenant hereby agrees that the Landlord and all its Partners and the Facility shall not be liable for, and Tenant hereby agrees during the term of this Lease to defend, indemnify and hold harmless the Landlord and the Facility from and against any and all claims, demands, obligations, liabilities, penalties, cause or causes of action and any and all costs and expenses, including, without limitation, attorneys' fees and costs, which arise out of or are incurred in connection with, injury to Tenant's business or any loss of income therefrom or for damages to the goods, wares, merchandise or other property of Tenant, Tenant's employees, agents, invitees, patients, occupants, or any other person in or about the Facility, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures of the same, or from any other cause, whether the said damage or injury results from conditions arising at the Facility or elsewhere and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible to Tenant. Excluded from Tenant's obligations set forth in this section are damages which are the

15

sole, direct and proximate result of Landlord's gross negligence, willful acts or omissions, or Landlord's material breach of this Lease, except to the extent that insurance coverage for Landlord's protection is required by the provisions of Article 14.

ARTICLE 14
INSURANCE

14.1    Tenant, at its sole cost and expense, shall maintain at all times during the term of this Lease bodily injury and property damage insurance to include personal injury and contractual liability, hospital (professional) liability, and owned and non owned automobile liability in an amount of not less than $3,000,000 per occurrence with an umbrella for an additional $5,000,000. Such insurance shall protect against claims arising out of Tenant's use or occupancy of the Facility and insure Landlord and its Lender(s) (if required by Lender(s) with respect to the ownership, maintenance, operation and use or occupancy of the Facility, including without limitation, the sole negligence and strict liability of Landlord. A "claims made" insuring form shall, to the extent commercially available, not be used.

14.2    Not more frequently than semi-annually, if in the reasonable discretion of any Lender, or the reasonable and good faith opinion of Landlord, the amount of any insurance required hereunder should be increased, or if the insurance requirements of this Lease should be expanded or otherwise modified, Tenant shall increase or modify the insurance coverage as required by any Lender or Landlord and, in such event, Tenant's monthly impound amount, if any, shall be increased accordingly.

14.3    Tenant, at its sole cost and expense, shall maintain at all times during the term of this Lease on all Tenant's personal property, Improvements and Alterations in, on, or about the Premises, a policy of insurance with "all risks" or "special form" coverage of direct physical loss, including flood (if the Premises are located within a flood plain) and including earthquake. Such insurance shall contain a replacement cost endorsement to the extent of 100% of their full replacement value. The proceeds from any such policy shall be used by Tenant for the replacement of personal property or the restoration of Tenant's Improvements or Alterations, subject to the rights of any lender.

14.4    At all times during the term of this Lease, Tenant at its sole cost and expense shall maintain on all the Personal Property described in Exhibit B, and all replacements thereof, and on the Real Property that are a part of the Premises, during the term of this Lease a policy or policies of insurance with "all risks" or "special form" coverage of direct physical loss, including flood (if the Premises are located within a flood plain) and including earthquake. Such insurance shall contain sprinkler leakage coverage and earthquake sprinkler leakage endorsements. The property to be insured under this section shall be continually insured in an amount not less than 100% current replacement cost, provide for replacement cost valuation in the event of an insured loss, and contain not less than a 90% average clause, 25% for earthquake sprinkler leakage. Tenant shall obtain a "stipulated or agreed amount" endorsement from the insurance carrier if such endorsement is available. The policy shall also contain provisions for, or endorsements

16

shall be obtained for, earthquake sprinkler leakage, demolition cost coverage of not less that ten percent (10%) of the face amount of hazard insurance carried on the building and other improvements, contingent liability from operation of building laws coverage (to cover an undamaged portion of an insured improvements that is required to be removed), and increased cost of construction coverage (for upgrading to current building codes, if necessary) . The insurance policy or policies shall insure both Landlord and Tenant, as their interests appear, with lender endorsements as required by any Lender.  In case this Lease is terminated, the insurance policy (if other than blanket) and all rights under it or the insurance proceeds shall be assigned to Landlord or its Lender(s) at Landlord's or any Lender's election subject to insurance company approval.  Tenant shall pay the premiums for maintaining the insurance required hereunder while the Lease is in force.  If (1) any Lender requires Landlord to escrow (impound) insurance premiums on a periodic basis during the term, or (2) in the event Tenant has defaulted in performance of any material provisions of this Article 14, Tenant, on notice from Landlord indicating this requirement shall pay sums of money toward its liability under this Article 14 to Landlord on a periodic basis in accordance with (1) the Lender's requirements, or (2) Landlord's requirements, as applicable.

14.5    In order to assure that the building and other improvements that are part of the Premises and the Personal Property are continually insured to their full value with replacement cost insurance, the full replacement value of the insurable improvements shall be determined by the company issuing the insurance policy at the time the policy is initially obtained.  Not more frequently than once every two (2) years, or sooner if required by any Lender, Landlord shall have the right to notify Tenant that it elects to have the replacement value redetermined by an insurance company, or by appraisal.  The redetermination shall be made promptly and in accordance with Marshall & Swift or similar Appraisal Company recognized and generally accepted by the insurance industry, and each party shall be promptly notified of the results by the company.  The insurance policy shall be adjusted according to the determination.  Tenant shall be obligated to forthwith increase the insurance coverage and pay the premiums therefor in accordance with any such determination.

14.6    At all times during the term of this Lease, Tenant at its sole cost and expense shall maintain loss of rental income coverage protecting against the "all risk" perils or "special form" perils, as the case may be, including earthquake and flood (if in a flood plain).  Earthquake sprinkler leakage coverage is to be specifically included in addition to any earthquake coverage, the intent being to provide this coverage at the lowest possible deductible in an amount equal to twelve (12) months' Base Monthly Rent, as the same may be adjusted from time to time, plus the estimated annual cost of real and personal property taxes and assessments and the annual premiums for insurance policies required to be carried by Tenant hereunder.  Such insurance shall name Landlord and Tenant as insureds as their respective interests may appear and shall provide for monthly payments to Landlord to the extent of Tenant's monthly obligations hereunder plus such amounts of taxes and insurance premiums as would be payable to Landlord if the same were being impounded monthly.  Such insurance shall provide for 60% contribution or coinsurance, or stipulated amount if this clause if reasonably available.

17

14.7    The parties release each other, and their respective owners, officers, directors, partners (including the shareholders, officers and directors of any corporate partners) and agents, from any claims for damage to any person or to the Facility or any part thereof, Tenant's Improvements, and alterations of either Landlord or Tenant in, on or about the Premises, that are caused by or result from risks insured against under any insurance policies carried by the parties and in force at the time of any such damage. Each party shall cause each insurance policy obtained by it to provide that the insurance company waives all right of recovery by way of subrogation against either party in connection with any damage covered by any policy. Neither party shall be liable to the other for any damage caused by fire or any of the risks insured against under any insurance policy required by this Lease. If any insurance policy cannot be obtained with a waiver of subrogation, or is obtainable only by the payment of an additional premium charge above that charged by insurance companies issuing policies without waiver of subrogation, the party undertaking to obtain the insurance shall notify the other party of this fact. The other party shall have a period of ten (10) days after receiving the notice either to place the insurance with a company that is reasonably satisfactory to the other party (and, in the case of insurance required to be carried by Tenant hereunder, complying with the provisions of Section 14.8 below) and that will carry the insurance with a waiver of subrogation, or to agree to pay the additional premium if such a policy is obtainable at additional cost. If the insurance cannot be obtained or the party in whose favor a waiver of subrogation is desired refuses to pay the additional premium charged, the other party is relieved of the obligation to obtain a waiver of subrogation rights with respect to the particular insurance involved.

14.8    All insurance policies required under this Lease shall:

14.8.1 Be issued by insurance companies authorized to do business in the state in which the Facility is located with a policyholders and financial rating of at least A:Class X status (or such other status as may be acceptable to Landlord in Landlord's sole discretion) as rated in the most recent edition of Best's Reports Guide;

14.8.2 Be issued as a primary policy; however, Tenant may carry the insurance under a blanket policy if the policy specifically provides that the amount of insurance required under this Lease will be in no way prejudiced by other losses covered by the policy; and

14.8.3 Contain an endorsement requiring thirty (30) days written notice from the insurance company to all parties including, without limitation, Landlord's Lenders, before cancellation or material change in the coverage, scope, or amount of any policy.

14.9    The policy, or a certificate of the policy itemizing all coverage's and extensions of coverage along with a copy (not a certified copy) of the policy together with evidence of payment of premiums, shall be deposited with Landlord at the Commencement Date, and on renewal of the policy, not less than twenty (20) days before expiration of the term of the policy. Landlord (and Landlord's Lenders, if required) shall be named as an insured (or additional insured) in the policy and all renewals and replacements thereof.

14.10   Deductible or retention provisions per loss contained for all insurance policies required by this Lease shall be for the account of and payable by Tenant and shall not exceed an aggregate amount of ten thousand dollars ($10,000).

14.11   Subject to the provisions of Article 16, the proceeds from any and all hazard insurance policies carried by Landlord shall be used solely for the purpose of repair, reconstruction, remodeling and replacement of the Facility or any part thereof damaged or destroyed, and shall be held by Landlord in trust for such purposes.

14.12   In the event Tenant does not maintain any of the foregoing policies of insurance, Landlord may, but shall not be obligated to, pay the premiums therefor, and such amounts plus interest at the maximum rate permitted by law, or if no maximum rate applies, at the rate of 18% per annum, from the date Landlord paid until the date of reimbursement shall be additional rent due hereunder and payable on the next payment date for monthly rent. Landlord's election to make said payments shall not be deemed a waiver of any other remedies, or an election of remedies by Landlord, nor as liquidated damages.

14.13   Tenant, at its sole cost and expense, shall obtain and maintain worker's compensation insurance (or evidence of a qualified self-insurance program if permitted by the law) in the state in which the Facility is located.

ARTICLE 15
CONDEMNATION

Definitions:

15.1.1   "Condemnation" means (1) the exercise of any governmental or governmentally-derived power, whether by legal proceedings or otherwise, by a Condemnor (as defined below), and (2) a voluntary sale or transfer by Landlord to any Condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

15.1.2   "Date of Taking" means the date the Condemnor has the right to possession of the property being condemned.

15.1.3   "Award" means all compensation, sums, or anything of value awarded, paid, or received on a total or partial Condemnation.

15.1.4   "Condemnor" means any public or quasi-public authority, or private entity or individual, having the power of Condemnation.

15.2   If during the term there is any taking of all or any part of the Premises or any interest in this Lease by Condemnation, the rights and obligations of the parties shall be determined pursuant to the provisions of this Article 15.

15.3    If the Premises are totally taken by Condemnation, this Lease shall terminate on the Date of Taking.

15.4    If the Premises are partially taken by Condemnation, this Lease shall remain in effect, except that Tenant can elect to terminate this Lease if the remaining portion of the Facility is rendered completely unusable for the uses permitted hereunder, provided that the Facility shall be considered completely unusable only if all of the skilled nursing beds become inoperable. if Tenant elects to terminate this Lease, Tenant must exercise its right to terminate by giving notice ("Termination Notice") to Landlord within thirty (30) days after the nature and extent of the taking have been finally determined. The Termination Notice shall state the date of termination, which date shall not be earlier than thirty (30) days nor later than ninety (90) days after Tenant has notified Landlord of its election to terminate (except that this Lease shall terminate on the Date of Taking if the Date of Taking falls on a date before the date of termination as designated by Tenant in the Termination Notice). If Tenant does not terminate this Lease within the thirty (30) day period, this Lease shall continue in full force and effect, except that Base Monthly Rent shall be reduced pursuant to Section 15.5 below.

15.5    If any portion of the Premises (other than that portion consisting of land upon which no buildings, improvements, parking areas, driveways, walkways or recreation areas are located, hereinafter referred to as Excluded Premises) is taken by Condemnation and this Lease remains in full force and effect, on the date of Award, the Base Monthly Rent shall be reduced by an amount that is in the same ratio to Base Monthly Rent as the amount that the Award bears to the total value of the Premises immediately before the date of Award.

15.6    If there is a partial taking of the Premises and this Lease remains in full force and effect, Landlord at its cost shall accomplish all necessary restoration. Base Monthly Rent shall be abated or reduced during the period from the date of taking until the completion of restoration, but all other obligations of Tenant under this Lease shall remain in full force and effect. The abatement or reduction of Base Monthly Rent shall be based on the extent to which the restoration interferes with Tenant's use of the Premises. If the Award is not sufficient to pay for restoration, Landlord may, in its sole discretion, elect to furnish the deficiency, or Landlord may elect to terminate this Lease. if Landlord elects to furnish the deficiency, Base Monthly Rent shall be adjusted,' commencing the month following the month in which Landlord makes such election and for the remainder of the term of the Lease, to reflect Landlord's contribution to such restoration plus an annual rate of return equal to five percent (5%) above the "Reference Rate" announced by Bank of America as in effect at the time of Landlord's election. Should Bank of America discontinue its practice of announcing a "Reference Rate", Landlord may elect to utilize from time to time a comparable rate announced by another lender selected by Landlord. If Landlord elects to terminate the Lease, Tenant may elect to furnish the deficiency by written notice to Landlord within ten (10) days following Landlord's notice to Tenant of Landlord's election to terminate hereunder.

15.7    If the Lease remains in full force and effect, the entire Award shall belong to and be paid to Landlord. If the Lease terminates,the Award shall belong to and be paid to Landlord, except that Tenant shall receive from the Award any sum awarded for relocation, plus any sum awarded for Tenant's Improvements or Alterations made to the Premises by Tenant in accordance with this Lease, which Tenant's Improvements or Alterations Tenant has the right to remove from the Premises pursuant to the provisions of this Lease but elects not to remove.

ARTICLE 16
DESTRUCTION

16.1    If during the term the Premises or any part thereof are totally or partially destroyed from a risk required to be covered by the insurance described in Article 14 of this Lease, Tenant shall restore the Premises to substantially the same condition as they were in immediately before destruction, whether or not the insurance proceeds are sufficient to cover the actual cost of restoration. Such destruction shall not terminate this Lease. If the existing laws do not permit the restoration, either party can terminate this Lease immediately by giving notice to the other party.

16.2    Subject to the provisions set forth below, if during the term the Premises or any part thereof are totally or partially destroyed from a risk not required to be covered by the insurance described in Article 14 of this Lease, Tenant shall restore the Premises to substantially the same condition as they were in immediately before destruction. Such destruction shall not terminate this Lease. If the existing laws do not permit the restoration, either party can terminate this Lease immediately by giving notice to the other party. If the cost of restoration exceeds $3,000,000 (the "Replacement Limit"), Tenant can elect to terminate this Lease by giving notice to Landlord within twenty (20) days after determining the restoration cost or replacement cost, which Tenant agrees to promptly and diligently obtain. if Tenant elects to terminate this Lease, Landlord, within thirty (30) days after receiving Tenant's notice to terminate, can elect to pay the actual cost of restoration in excess of the Replacement Limit, in which case Tenant shall restore the Premises. On Landlord's making its election to contribute, each party shall deposit immediately the amount of its contribution with the Insurance Trustee provided for in Section 16.6 below. If the cost of restoration does not exceed the Replacement Limit, Tenant shall immediately deposit the cost of restoration with the Insurance Trustee.

16.3    As used in Sections 16.4 and 16.12 hereof:

16.3.1 "Index" shall mean the Consumer Price Index for All Urban Consumers, Los Angeles/Anaheim/Riverside Metropolitan Area, 1982-1984 = 100, published by the Bureau of Labor Statistics of the U.S. Department of Labor.

16.3.2 "Adjustment Date" shall mean each anniversary of the Commencement Date during the term of this Lease.

16.3.3 "Percentage Increase of Index" shall mean the percentage of increase in the Index

21

on the Adjustment Date equal to a fraction, the numerator of which shall be the Index on such Adjustment Date less the Index on the Commencement Date, and the denominator of which shall be the Index on the Commencement Date. In the event the Index shall hereafter be converted to a different standard reference base or otherwise revised, the Index for each Adjustment Date shall be the one reported in the U.S. Department of Labor's newest comprehensive official index then in use and most nearly answering the description of the foregoing Index. If it is calculated from a base different from 1982-1984 = 100, the determination of Percentage Increase of Index shall be made using a formula supplied by the Bureau of Labor Statistics, or if the Bureau shall not publish the same, it shall be determined by using any other nationally recognized publisher of similar statistical information on which the parties may agree. If they are unable to agree within thirty (30) days after demand by either party, a substitute index shall, on application of either party, be selected by the chief officer of the San Francisco regional office of the Bureau, or its successor.

16.4    The Replacement Limit figure set forth above in Section 16.2 shall be increased on each Adjustment Date for the Lease Year commencing on such Adjustment Date by an amount equal to such figure multiplied by the Percentage Increase of Index.

16.5    If during the term any portion of the Premises are damaged or destroyed from a risk covered by the insurance described in Article 14 of this Lease, and the total amount of loss does not exceed ten thousand dollars ($10,000), Tenant shall make the loss adjustment with the insurance company insuring the loss. The proceeds shall be paid directly to Tenant for the sole purpose of making the restoration of the Premises in accordance with Sections 16.9 et seg. of this Lease.

16.6    If during the term any portion of the Premises are damaged or destroyed from a risk covered by the insurance described in Article 14 of this Lease, and the total amount of loss exceeds ten thousand dollars ($10,000), Tenant shall, with Landlord's approval, make the loss adjustment with the insurance company insuring the loss, and on receipt of the proceeds, the parties shall immediately pay them to a bank, savings and loan association, or other person or company furnishing construction disbursement control services acceptable to Landlord ("Insurance Trustee") to act as insurance trustee hereunder.

16.7    All sums ("Trust Funds") deposited with the Insurance Trustee (including insurance proceeds) shall be held for the following purposes and the Insurance Trustee shall have the following powers and duties:

16.7.1  The Trust Funds shall be paid in installments by the Insurance Trustee to the contractor retained by Tenant as construction progresses, for payment of the cost of restoration. A 10% retention fund shall be established that will be paid to the contractor on the last to occur of (i) completion of restoration, (ii) payment of all costs thereof, (iii) receipt of all necessary governmental inspection approvals, (iv) expiration of all applicable lien periods, and (v) proof that the Premises are free of all mechanics' liens and lienable claims.

16.7.2  Payments shall be made on presentation of certificates or vouchers from the architect, engineer, or other inspection agency retained by the Insurance Trustee or Tenant showing the amount due.  If the Insurance Trustee, or Landlord, in its reasonable discretion, determines that the certificates or vouchers are being improperly approved, either shall have the right to appoint an architect, engineer, or inspection agency to supervise construction and to make payments only on certificates or vouchers approved by such person.  The expenses and charges of the person retained by Landlord or Insurance Trustee shall be paid out of the Trust Funds.

16.7.3  If after deposit by the parties of all sums required by this Article 16, the sums held by the Insurance Trustee are not sufficient to pay the actual cost of restoration, Tenant and/or Landlord (as applicable) shall deposit the amount of the deficiency with the Insurance Trustee within seven (7) days after request by the Insurance Trustee indicating the amount of the deficiency.

16.7.4  Insurance proceeds not disbursed by the Insurance Trustee after restoration has been completed and final payment has been made to Tenant's contractor shall be delivered within seven (7) days (after demand made by either party on the Insurance Trustee, with a copy to Landlord's Lender) by the Insurance Trustee to Landlord's Lender and shall be applied by Landlord's Lender to reduce the balance of the loan held by the Lender.

16.7.5  Any undisbursed funds after compliance with the provisions of this Article 16 shall be delivered to Landlord.  All actual costs and charges of the Insurance Trustee shall be paid by Tenant.

16.7.6  If the Insurance Trustee resigns or for any reason is unwilling to act or continue to act, the parties shall jointly substitute a new trustee meeting the requirements of Section 16.6 above in the place of the designated Insurance Trustee.

16.8    If Landlord is required to or elects to restore the Premises as provided in this Article 16, Landlord shall not be required to restore Tenant's Improvements, Alterations, trade fixtures, equipment or personal property, such excluded items being the sole responsibility of Tenant to restore.

16.9    Promptly following the date that Tenant is obligated to restore the Premises, Tenant at its cost shall prepare final plans and specifications and working drawings (collectively "Plans") complying with applicable laws that will be necessary for restoration of the Premises.  The Plans shall be subject to approval by Landlord. Landlord shall have twenty (20) days after receipt of the Plans to either approve or disapprove the Plans and return them to Tenant.  If Landlord disapproves the Plans, Landlord shall notify Tenant of its objections, and Tenant shall submit required Plans responding to Landlord's objections.  The process shall continue until Landlord has approved the Plans.  Any unresolved controversy arising out of or relating to this Section 16.9 shall be settled by arbitration in accordance with the then-prevailing rules of the

American Arbitration Association, and judgment upon the award may be entered in any Court having jurisdiction thereof. Tenant acknowledges that the Plans shall be subject to approval of the appropriate government bodies and that they will be prepared in such a manner as to obtain that approval.

16.10   The restoration shall be accomplished as follows:

16.10.1      Tenant shall complete the restoration as promptly as possible after final Plans have been approved by Landlord and all appropriate government bodies and all required permits have been obtained (subject to a reasonable extension for delays resulting from causes beyond Tenant's reasonable control).

16.10.2      Tenant shall retain a licensed general contractor that is bondable. The contractor shall be required to carry public liability and workers' compensation insurance, and such other coverage's as may be reasonably required by Landlord or its Lender, during the period of construction. Landlord, Landlord's Lender if required and Tenant shall be named as additional insured's on the contractor's general liability insurance policy. Such insurance shall contain a waiver of subrogation clause in favor of Landlord and Tenant. The contract for restoration between Tenant and its contractor shall be approved by Landlord, in advance, which approval shall not be unreasonably withheld. During restoration, Tenant, at its sole cost and expense, shall take out a course of construction policy that includes Landlord (and Landlord's Lender, if required) as an insured. Such policy shall provide for "special form" perils coverage, but shall exclude earthquake, in an amount sufficient to protect an estimated amount to complete the restoration, including transit and installation coverage.

16.10.3      Tenant shall notify Landlord of the date of commencement of the restoration at least ten (10) days before commencement of the restoration. The contractor retained by Tenant shall not commence construction until a performance bond and a labor and material payment bond in the full amount of the cost of restoration have been delivered to Landlord to insure completion of the construction.

16.10.4      Tenant shall accomplish the restoration in a manner that will cause the least inconvenience, annoyance, and disruption to the Premises.

16.10.5      Prior to commencement of construction of the restoration and upon completion of the restoration, Tenant shall immediately furnish Landlord evidence satisfactory to Landlord that the restoration complies with all applicable statutes, ordinances, codes and law and that all necessary and applicable permits and approvals have been obtained for the restoration.

16.10.6      The restoration shall not be commenced until sums sufficient to cover the cost of restoration are placed with the Insurance Trustee.

16.11      In case of damage or destruction to the Premises or any part thereof, there shall be no abatement or reduction of Rent.

16.12   If damage or destruction to the Premises occurs during the last Lease Year of the term, the cost of repairing which exceeds $150,000 (the "Termination Limit"), either party may terminate this Lease by giving notice to the other not more than thirty (30) days after the event of damage or destruction. The Termination Limit figure set forth herein shall be increased on each Adjustment Date by an amount equal to such figure multiplied by the Percentage Increase in Index (as defined in Section 16.3 above).

16.13   The provisions of this Article 16 assume that the insurance proceeds, in the event of an insurable loss, are made available to the parties for the purpose of restoration of the Premises. In the event that Landlord's Lender(s) refuse(s) to make the proceeds available for such purpose, having the right to do so, and/or as a condition of making the proceeds available alter(s) the terms of any obligations secured by encumbrances) affecting the Premises so as to materially change the cost of or the manner in which such obligations) is/are to be paid or discharged, Landlord shall have the right to terminate this Lease by giving notice to Tenant not later than thirty (30) days after determination of such conditions).

ARTICLE 17
ASSIGNMENT AND SUBLETTING

17.1   Tenant shall not voluntarily assign or otherwise transfer or encumber its interest in this Lease or in the Premises, including but not limited to, entering into a management agreement or contract with anyone to operate the Facility (collectively an "assignment"), or sublease all or any part of the Premises or allow any other person or entity (except Tenant's agents, invitees and patients) to occupy or use all or any part of the Premises (collectively a "sublease"), without first obtaining Landlord's written consent, to be granted at Landlord's discretion and on such business terms as Landlord may approve. Any assignment or sublease without Landlord's written consent shall be voidable and, at Landlord's election, shall constitute default under this Lease. No consent to any assignment or sublease shall constitute consent to any future assignment, encumbrance or sublease or a further waiver of the provisions of this Article 17. If Tenant is a partnership, a withdrawal or change, voluntary, involuntary, or by operation of law, of a partner or partners owning 51% or more of the partnership, or the dissolution of the partnership, shall be deemed a voluntary assignment. If Tenant consists of more than one person, a purported assignment, voluntary, involuntary, or by operation of law, from a majority of persons to the others shall be deemed a voluntary assignment. If Tenant is a corporation, any dissolution, merger, consolidation, or other reorganization of Tenant, or (except by the voluntary act of Landlord) the sale or other transfer of a controlling percentage of the capital stock of Tenant, or the sale of 51% of the value of the assets of Tenant, shall be deemed a voluntary assignment. If Harold Nash seeks to be the primary executive officer and owner, Tenant shall be deemed a voluntary assignment. The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing at least fifty-one percent (51%) or more of the total combined voting power of all classes of Tenant's capital stock issued, outstanding, and entitled to vote for the election of directors. Consent of Landlord to an assignment or sublease may be withheld in

25

Landlord's sole and absolute discretion.

17.2     Notwithstanding anything to the contrary contained herein, Landlord's acceptance of rent from any person or entity other than Tenant shall not be deemed, in and of itself, to be a waiver of any of the provisions of this Lease or a consent to an assignment or subletting.

17.3     No sublease entered into by Tenant shall be effective unless and until it has been approved in writing by Landlord. In entering into any sublease, Tenant shall use only such form of sublease as is satisfactory to Landlord, and once approved by Landlord; such sublease shall not be changed or modified without Landlords prior written consent.

17.4     Any assignee or sublessee shall, by reason of entering into an assignment or sublease under this Lease, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every obligation under this Lease to be performed by Tenant other than such obligations as are contrary to or inconsistent with provisions contained in an assignment or sublease to which Landlord has expressly consented in writing.

17.5     If Tenant's obligations under this Lease have been guaranteed by third parties, then an assignment or sublease (and Landlord's consent thereto) shall not be effective unless said guarantors give their written consent to such assignment or sublease and the terms thereof and acknowledge their continued liability hereunder.

17.6     The consent by Landlord to any assignment or sublease shall not release Tenant or guarantors) (if any) from their obligations under this Lease and/or any guaranties or alter the primary liability of Tenant or guarantors) to pay the Rent and perform and comply with all of the obligations of Tenant to be performed under this Lease.

17.7     If Tenant requests Landlord to consent to a proposed assignment or sublease, Tenant shall pay to Landlord (whether or not consent is ultimately given) a reasonable sum not exceeding one-half of one month's then-current Base Monthly Rent on account of Landlord's costs, expenses and attorneys' fees in connection with such request.

17.8     No interest of Tenant in this Lease shall be assignable by operation of law (including, without limitation, the transfer of this Lease by testacy or intestacy). Each of the following acts shall be considered an involuntary assignment:

17.8.1   If Tenant is or becomes bankrupt or insolvent, makes an assignment for the benefit of creditors, or institutes a proceeding under the Bankruptcy Code in which Tenant is the debtor;

17.8.2   If a writ of attachment or execution is levied on this Lease;

17.8.3   if, in any proceeding or action to which Tenant is a party, a receiver is appointed with authority to take possession of the Premises.

17.9    An involuntary assignment shall constitute a default by Tenant and Landlord shall have the right to elect to terminate this Lease, in which case this Lease shall not be treated as an asset of Tenant.  If a writ of attachment or execution is levied on this Lease, Tenant shall have forty-five (45) days in which to cause the attachment or execution to be removed.

17.10   Bankruptcy:

17.10.1    If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code"), any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code.

17.10.2    If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment setting forth (i) the name and address of such person, (ii) all of the terms and conditions of such offer, and (iii) the adequate assurance to be provided Landlord to assure such person's further performance under the Lease, including, without limitation, the assurance referred to in Section 365(f) (3) (B) of the Bankruptcy Code, shall be given to Landlord by Tenant no later than twenty (20) days after receipt by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person, less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease.

17.10.3    Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment.  Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

17.11    Tenant immediately and irrevocably assigns to Landlord, as security for Tenants obligations under this Lease, all payments of Rent from any subletting of all or part of the Premises as permitted by this Lease; however, Landlord's security interest in such Rent payments is limited to the extent of Tenant's payment obligations under this Lease.  Landlord, as successor and as attorney-in-fact for Tenant or a receiver for Tenant appointed on Landlord's application, may collect such Rent and apply it toward Tenant's

obligations under this Lease. However, until the occurrence of an act of default by Tenant, Tenant shall have the right to collect such Rent. Nothing herein is intended to abrogate or affect the provisions of Section 17.8.

17.12        Following the consent to an assignment or sublease, Landlord may, but shall not be obligated to, consent to subsequent subleases or assignments of the sublease or any amendments or modifications thereto without notifying Tenant, any guarantors, or any other persons liable on the Lease or any sublease and without obtaining their consent, and such action shall not relieve such persons from liability under this Lease or any sublease.

## ARTICLE 18
## DEFAULTS; REMEDIES

18.1    Defaults.  The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

18.1.1  Failure to pay Rent or any other sums required to be paid under this Lease when due if the failure continues for fifteen (15) days after its due date for Monthly Base Rent or five (5) days after its due date for all other sums.

18.1.2  Abandonment, except for emergencies, of the Facility (failure to maintain legally-required staff for the operation of the Facility for eight (8) consecutive hours shall be deemed an abandonment).  Vacation of the Facility due to acts of God, natural catastrophes, war, riot or other similar events beyond Tenant's control, shall not be deemed an abandonment.

18.1.3  Tenant or any guarantor of Tenant's obligations hereunder fails to pay its debts as they become due, or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors.

18.1.4  Commencement by Tenant or any guarantor of Tenant's obligations hereunder of any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver ' trustee, custodian or other similar official for it or for all or any substantial part of its property.

18.1.5  Tenant or any guarantor of Tenant's obligations hereunder taking any corporate action to authorize any of the actions set forth above.

18.1.6  Commencement of any case, proceeding or other action against Tenant or any guarantor of Tenant's obligations hereunder seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation,

dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver ' trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action (i) results in the entry of an order for relief against it which is not fully stayed within seven (7) business days after entry thereof or (ii) remains undismissed for a period of forty-five (45) days.

18.1.7 Notwithstanding any other provisions of this Lease, the failure of Tenant to comply with any of the provisions of the Lease or any other act or omission by Tenant (whether occurring at the Facility or elsewhere) which, in the reasonable and good faith judgment of Landlord, places in imminent jeopardy the continued licensing and/or certification of the Facility as then currently licensed, and/or its certification as either a Medicare or Medicaid provider (if then currently certified as such), and if, within twenty-four (24) hours after written notice thereof from Landlord to Tenant, Tenant shall not have either (1) cured such failure, or (2) obtained an injunction or other order preventing revocation or suspension of licensing and/or decertification of the Facility by virtue of such failure or alleged, failure, or (3) provided Landlord with assurances satisfactory to Landlord that the Facility will not be subject to license suspension or revocation and/or decertification as a result of such failure or alleged failure.

18.1.8 Notwithstanding any other provisions of this Lease, a release, generation or disposal of Hazardous Substances from the Premises or onto the Premises, except in accordance with law.

18.1.9 Failure by Tenant to observe or perform any other covenants, conditions, or provisions of this Lease to be observed or performed by Tenant (except where a different period of time is specified in this Lease) where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant. If the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, Tenant shall not be deemed to be in default if Tenant commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

18.2    Remedies. Landlord shall have the following remedies without further notice to Tenant if Tenant commits a default. These remedies are not exclusive and are in addition to any other remedies provided hereunder or allowed at law or equity:

18.2.1 Landlord may reenter and resume possession of the Facility, and remove Tenant and Tenant's property therefrom, and at its option either terminate this Lease or, without terminating it, lease the Facility for the account of Tenant for the remainder of the term or for such term or terms as Landlord shall see fit. Should Landlord elect to lease the Facility for the account of Tenant, Tenant shall pay Landlord on demand the cost of renovating, repairing and altering the Facility for a new tenant or tenants, expenses of relicensing and/or recertification which may be incurred by Landlord or a new tenant, and also pay Landlord each month of Tenant's unexpired term the Rent herein before agreed to be paid, less such part, if any, thereof as Landlord shall have been able to collect from a new tenant or tenants. Should default be made by Tenant, as aforesaid, Landlord may,

on the other hand, should it so desire, without reentering or resuming possession of the Facility and without terminating this Lease, enforce, by all proper and legal suits and other means, its rights hereunder, including the collection of Rent. Should it be necessary for Landlord to take any legal action hereunder, Tenant shall pay Landlord all reasonable attorneys' fees and all other costs and expenses incurred by Landlord in connection with such action. Landlord may, in its sole and absolute discretion, elect to have a receiver appointed to affect any of the remedies set forth in this section 18. 2'. If a receiver is appointed, Tenant shall pay, without limitation, all the associated direct and indirect costs of such appointment.

18.2.2  If Landlord elects to relet the Facility as provided in this Section 18.2, Rent that Landlord receives from reletting shall be applied to the payment of: First, any indebtedness from Tenant to Landlord other than Rent due from Tenant; second, all costs, including for maintenance, incurred by Landlord in reletting; and third, Rent due and unpaid under this Lease. After deducting the payments referred to in this paragraph, any sum remaining from the Rent Landlord receives from reletting shall be held by Landlord and applied in payment of future Rent as Rent becomes due under this Lease. In no event shall Tenant be entitled to any excess Rent received by Landlord. If, on the date Rent is due under this Lease, the Rent received from the reletting is less than the Rent due on that date, Tenant shall pay to Landlord, in addition to the remaining Rent due, all costs, including for maintenance, Landlord incurred in reletting that remain after applying the Rent received from the reletting as provided in this Section 18.2.

18.2.3  In the event of a default under Section 18.1.8 above, Landlord may, in addition to all other remedies which it may pursue, elect to shut down Tenant's operations and require cleanup of the contamination at Tenant's expense while still enforcing the remaining terms of this Lease. In such event, Landlord shall have no liability to Tenant for any damages arising out of the shutdown of operation. If Landlord elects to terminate the Lease on account of such default, Landlord shall be entitled to collect as an item of its damages cost of cleanup of the contamination.

18.2.4  Landlord, at any time after Tenant commits a default, can cure the default at Tenant's cost. If Landlord at any time, by reason of Tenant's default, pays any sum or does any act that requires the payment of any sum, the sum paid by Landlord shall be due immediately from Tenant to Landlord at the time the sum is paid, and if repaid at a later date, shall bear interest at the maximum rate permitted by law, or if no maximum rate applies, then 18% per annum, from the date the sum is paid by Landlord until Landlord is reimbursed by Tenant.

18.2.5  In the event that the Facility is excluded from participating in the Medicaid program (or any similar or successor program) for the state in which the Facility is located, such exclusion shall be deemed a breach of this Lease. The addition to all remedies available to Landlord under the Lease and under applicable law, Landlord shall have the right, following written demand to Tenant, to require Tenant to deliver possession of the Facility to Landlord or to a nursing home operator of Landlord's choice, and Tenant agrees to promptly comply with any such demand. Unless expressly set forth

by Landlord in writing, no such demand, nor change of possession pursuant thereto, shall be deemed a termination of this Lease or a release of Tenant from any of its obligations under the Lease. Unless and until this Lease (or the Guaranty, as the case may be) is terminated by Landlord, Tenant and each guarantor of Tenant's performance, shall remain liable under the terms of this Lease and such Guaranty respectively. it is agreed that an action excluding the Facility from participation in a Medicaid program shall not be deemed to have occurred until such action is final in the sense that all appeal rights have expired. No action to exclude shall be deemed to have occurred unless the period of exclusion exceeds sixty (60) days.

18.2.6  Should Landlord require Tenant to deliver possession of the Facility to Landlord or to another nursing home operator following a breach of the Lease by Tenant, Tenant agrees to fully cooperate with Landlord and/or such new operator in effecting a transition in the operation of the Facility that will least disrupt the continuing operation and the comfort and welfare of the patients. Such cooperation shall include, to the extent deemed necessary by Landlord and permitted under applicable law, permission by Tenant for such new operator (1) to operate for his own account under Tenant's license pursuant to a management agreement, and (2) to bill under Tenant's Medicare and Medicaid numbers, until new licenses and provider agreements are obtained.

18.3    If Landlord is in default of this Lease, and as a consequence Tenant recovers a money judgment against Landlord, the judgment shall be satisfied only out of (1) the proceeds of sale received by voluntary sale of, or on execution of the judgment against, the right, title and interest of Landlord in the Facility or (2) Rent or other income from the Facility receivable by Landlord. Neither Landlord nor any of the partners comprising any partnership designated as Landlord (including, in the case of a corporate partner, the shareholders, directors and officers thereof) shall be personally liable for any deficiency.


ARTICLE 19
SIGNS

19.1    Subject to Landlord's prior written approval, Tenant at its cost shall have the right to place, construct, and maintain on the Premises one or more signs advertising its business at the Premises. Any sign that Tenant has the right to place, construct, and maintain shall comply with all laws, ordinances, regulations and covenants, conditions and restrictions affecting the Premises, and Tenant shall obtain any approval required thereby. Landlord makes no representation with respect to Tenant's ability to obtain such approval. Upon the expiration or sooner termination of this Lease, Tenant shall, at the option of Landlord, either remove any signs erected by Tenant and repair the Premises to the same condition it was in prior to the installation or construction of the sign(s), or leave such signs in place for Landlords benefit. Upon expiration or termination of this Lease, Tenant hereby consents to the use by Landlord, at Landlord's election, of the name of the Facility and Tenant hereby presently assigns to Landlord the right, title and interest of Tenant in the name of the Facility, provided that as long as Tenant is not in default hereunder and/or until the expiration or termination of this Lease, Landlord consents to

31

Tenant's use of said name and signs for the benefit of the Facility.  Said name shall not be changed without Landlord's prior written consent.

# ARTICLE 20
## RIGHT OF ENTRY

20.1    Landlord and its authorized representatives shall have the right to enter the Premises at all reasonable times in order to:  20.1.1 Determine whether the Facility is in good condition and whether Tenant is complying with its obligations under this Lease;

20.1.2  Do any necessary maintenance and to make any restoration to the Premises that Landlord has the right or may have the obligation to perform; provided, that nothing herein contained shall constitute an obligation on the part of Landlord or its designated representative to maintain or restore the Premises or any part thereof;

20.1.3  Serve, post, or keep posted any notices required or allowed under the provisions of this Lease or applicable law;

20.1.4  Post "for rent" or "for lease" signs during the last six (6) months of the term, or during any period while Tenant is in default; and

20.1.5  Show the Premises to prospective brokers, agents, buyers, tenants, or persons interested in an exchange, at any time during the term. 1

20.2    Landlord shall not be liable in any manner for any inconvenience, disturbance, loss of business, nuisance, or other damage arising out of Landlord's entry on the Premises as provided in this Article 20, except damage resulting from the negligent or intentional acts or omissions of Landlord or its authorized representatives.

20.3    Tenant shall not be entitled to an abatement or reduction of Rent or any part thereof if Landlord exercises any rights reserved in this Article 20.  Landlord shall conduct its activities on the Premises as allowed in this Article 20 in a manner that will cause as little inconvenience, annoyance, or disturbance to Tenant as reasonably practicable.

# ARTICLE 21
## SUBORDINATION; ESTOPPEL; CERTIFICATION

21.1    This Lease is and shall be subordinate to any Encumbrance now or hereafter recorded affecting all or any part of the Premises including all advances made or to be made thereunder, and all renewals, replacements, consolidations and extensions thereof. Such subordination is effective without any further act of Tenant. Tenant shall from time to time, on request of Landlord, execute and deliver any documents or instruments that

may be required by a Lender to effectuate any subordination. If Tenant fails to execute and deliver any such documents or instruments, Tenant irrevocably constitutes and appoints Landlord as Tenant's special attorney-in-fact to execute and deliver any such documents or instruments.

21.2   Notwithstanding the above, if a Lender requires that this Lease be subordinate to any such Encumbrance, this Lease shall be subordinate to that Encumbrance if Landlord obtains from the Lender a written agreement providing, substantially, that as long as Tenant performs its obligations under this Lease, no foreclosure of, deed given in lieu of foreclosure of, or sale under the Encumbrance shall affect Tenant's rights under this Lease. Such agreement shall further provide that the provisions of this Lease concerning disposition of insurance proceeds on damage or destruction of Premises, and disposition of condemnation awards, shall prevail over any conflicting provisions in the Encumbrance.

21.3   Tenant shall attorn to any purchaser at any foreclosure sale, or to any grantee or transferee designated in any deed given in lieu of foreclosure. Tenant shall execute upon demand any and all documents required by Lender(s) to accomplish the purpose of this Article 21.

21.4   Tenant, within ten (10) days after notice from Landlord, shall execute and deliver to Landlord a certificate in recordable form stating that this Lease is unmodified and in full force and effect, or in full force and effect as modified, and stating the modifications. The certificate also shall state the amount of Base Monthly Rent then applicable, the dates to which the Base Monthly Rent has been paid in advance, and the amount of any security deposit or prepaid Rent. Failure to deliver the certificate within the ten (10) days shall be conclusive upon Tenant that this Lease is in full force and effect and has not been modified, that no Base Monthly Rent other than for the current month has been paid in advance, that the security deposit is in the amount set forth in this Lease and that there is no other prepaid Rent, all except as may be represented otherwise by Landlord in the certificate. If Tenant fails to deliver the certificate within the ten (10) days, Tenant irrevocably constitutes and appoints Landlord as its special attorney-in-fact to execute and deliver the certificate to any third party.

## ARTICLE 22
## WAIVER

22.1   No delay or omission in the exercise of any right or remedy of Landlord upon any default by Tenant shall impair such right or remedy or be construed as a waiver.

22.2 The receipt and acceptance by Landlord of delinquent Rent or any other amounts due hereunder shall not constitute a waiver of such default or any other default or a waiver to demand timely performance in the future.

22.3   No act or conduct of Landlord including, without limitation, the acceptance of the

keys to the Premises, shall constitute an acceptance of the surrender of the Premises by Tenant before the expiration of the term, only a written notice from Landlord to Tenant shall constitute acceptance of the surrender of the Premises and accomplish a termination of the Lease.

22.4 Either party's consent to or approval of any act by the other requiring such party's consent or approval shall not be deemed to waive or render unnecessary such party's consent to or approval of any subsequent act by the other.

22.5 Any waiver by Landlord or Tenant of any default must be in writing and shall not be a waiver of any other default concerning the same or any other provision of the Lease.

22.6    In the event Tenant defaults under any provisions of this Lease and Landlord elects to reenter and resume possession of the Premises and remove Tenant therefrom, Tenant hereby waives the notice to vacate prior to filing an eviction suit, will leave the Premises immediately upon request and cooperate fully with Landlord's re-entry, possession and operation of the Premises.

## ARTICLE 23
## SALE OR TRANSFER OF PREMISES

23.1    If Landlord sells or transfers the Facility or any interests therein, Landlord, on consummation of the sale or transfer, shall be released from any liability thereafter accruing under this Lease provided the transferee assumes all obligations of Landlord hereunder.

## ARTICLE 24
## FINANCIAL STATEMENTS AND OPERATING INFORMATION

24.1    During the term of this Lease, Tenant shall provide Landlord a copy of Tenant's true and complete income statement, prepared by an independent certified public accountant in accordance with generally accepted accounting principles, reflecting Tenant's operations both at the Premises and as a whole, for each fiscal year of Tenant falling totally or partially within the term of this Lease, and a balance sheet as of the end of each fiscal year prepared in like manner for the Premises and for Tenant as a whole, which statements shall be delivered to Landlord within ninety (90) days following the expiration of Tenant's fiscal year.  Notwithstanding the foregoing, in the event that Tenant does not regularly employ its independent certified public accountants to prepare, audit or review the financial statements for the Premises, Tenant shall deliver its internally prepared financial statements for the Premises prepared in accordance with generally accepted accounting principles and certified as true and correct by Tenant.  In addition, Tenant shall provide Landlord a copy of Tenant's quarterly income statement reflecting Tenant's operations both at the Premises and as a whole for each calendar quarter falling totally or partially within the term of this Lease together with a balance sheet as of the end of each such quarter for the Premises and for Tenant as a whole,

34

which shall be delivered to Landlord within thirty (30) days following the expiration of, each calendar quarter and which statements shall be prepared in accordance with generally accepted accounting principles and certified as true and correct by Tenant. With each of the foregoing income statements and balance sheets furnished by Tenant, statements of cash flow for the same periods for the Premises and for Tenant as a whole shall also be provided to Landlord.

24.2    For any period that Tenant is not operating the Premises, and the same are being operated by a permitted subtenant or successor of Tenant, Tenant shall obtain financial statements of such subtenant/successor equivalent to those required of Tenant pursuant to Section 24.1 above not less often than quarterly, and shall forward copies of same to Landlord promptly upon receipt. Nothing herein shall relieve Tenant from the obligation to furnish the financial statements required pursuant to Section 24.1 above.

24.3 During the term of this Lease, Tenant shall provide Landlord quarterly with a census report detailing current and projected occupancy for the Facility including information regarding Medicare and Medicaid reimbursements. Such reports shall be delivered to Landlord within thirty (30) days following the expiration of each calendar quarter.

## ARTICLE 25
## LICENSING

25.1    Tenant shall maintain at all times during the term hereof and any extensions or holdover period all governmental licenses, permits and authorizations necessary for the establishment and operation of the Licensed Facility in the city, county and state in which the Facility is located, and shall qualify and comply with all applicable laws as they may from time to time exist, including those applicable to certification and participation as a provider under Medicare and Medicaid legislation and regulations. Tenant shall not, without the prior written consent of Landlord (which it agrees not to unreasonably withhold) effect any change in the license category or status of the Facility or any part thereof.

25.2    Nothing in this Lease shall be construed as granting Tenant any right, title or interest in or to the beds which are located at the Facility or granting Tenant any right to move the beds to another facility owned or operated by Tenant, it being understood and agreed that Tenant's only right hereunder is to operate the Facility during the term hereof as the Licensed Facility in accordance with the terms hereof.

## ARTICLE 26
## SURRENDER OF PREMISES; HOLDING OVER

26.1    on the earlier to occur of the expiration of the term hereof or ten (10) days after sooner termination of the term, Tenant shall surrender to Landlord the Facility and all Tenant's Improvements and Alterations thereto in good condition, free of all violations and citations, and fit for use by Landlord as the Licensed Facility (except for ordinary wear and tear and insured casualty) , excluding alterations that Tenant has the right to

remove or is obligated to remove under the provisions of Article 10, but including, without limitation, any and all patients, patient records, and any and all documents of every kind whatsoever necessary to enable Landlord to continue operation and including at least a three (3) day supply of necessary inventory and operational items.

26.2    If Tenant fails to surrender the Facility as required by this Article 26, Tenant shall hold Landlord harmless from all damages resulting from Tenant's failure to surrender the Facility, including, without limitation, claims made by a succeeding tenant resulting from Tenant's failure to surrender the Facility.

26.3    The Base Monthly rent for such month to month tenancy shall be one hundred twenty-five percent (125%) of the Base Monthly Rent for the month immediately preceding the date on which Tenant was required to surrender possession under the term of this Lease.

26.4    Tenant shall fully cooperate with Landlord in turning the Facility over to Landlord so as to assure to Landlord and patients uninterrupted patient care.

## ARTICLE 27
## PRESERVATION OF PATIENT RECORDS

27.1    Tenant shall preserve all patient charts and records as required by applicable law and deliver them to Landlord on expiration or sooner termination of this Lease.

## ARTICLE 28
## PATIENT CARE; CENSUS

28.1    Tenant shall take all steps appropriate to maintain a high level of quality patient care, and to promote and maintain a high patient census at the Facility consistent with law and ethical standards governing the operation of nursing homes. Except as otherwise permitted by law, Tenant shall not transfer patients from the Facility except for reasons of health, family request and/or convenience or request of the patient, and shall not transfer patients to another facility or facilities owned or operated directly or indirectly by Tenant, or in which Tenant has any interest, except in cases where an alternative facility is not available, or pursuant to a request by the patient or family.

## ARTICLE 29
## MISCELLANEOUS

29.1    Time is of the essence of each provision of this Lease.

29.2 Each party represents that it has not had dealings with any real estate broker, finder, or other person, with respect to this Lease in any manner. Each party shall hold harmless the other party from all damages resulting from any misrepresentations hereunder.

29.3    All exhibits referred to are attached to this Lease and incorporated by reference.

29.4    All provisions, whether covenants or conditions on the part of Tenant, shall be deemed to be both covenants and conditions.

29.5    This Lease together with the Lease Guaranty attached hereto (if any) contains all the agreements of the parties with respect to the subject matter hereof and cannot be amended or modified except by a written agreement signed by Landlord, Tenant and Guarantor(s) (if any).

29.6    Any notice, demand, request, consent, approval or communication that either party desires or is required to give to the other party or any other person shall be in writing and either served personally or sent by registered or certified United States mail, or by courier mail or by facsimile. Any notice, demand, request, consent, approval or communication that either party desires or is required to give to the other party shall be addressed to the other party at the address appearing on the signature page of this Lease. Either party may change its address by notifying the other party of the change of address. Notice shall be deemed communicated within three (3) business days from the time of deposit in the United States mail if mailed as provided in this section, or upon delivery or refusal of delivery if delivered personally or by courier mail or by facsimile.

29.7    In the event of default hereunder by either party, and the other party engages an attorney to prepare a notice or notices and/or to otherwise communicate with the defaulting party, then the defaulting party shall be liable to the other party for its reasonable attorneys' fees incurred by it for such services.

29.8    If any party brings an action or proceeding to enforce or interpret the terms hereof or declare rights hereunder, the prevailing party (as hereinafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "prevailing party" shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys, fees reasonably incurred. Landlord shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default or resulting breach. If either party or its authorized representatives ("Passive Party") becomes a party to any litigation concerning the Lease, or the Facility, by reason of any act or omission of the other party or its authorized representatives ("Active Party") and not by any act or omission of the Passive Party or any act or omission of its authorized representatives, the Active Party shall be liable to the Passive party for reasonable attorneys' fees and court costs incurred by the Passive Party in that litigation.

29.9   This document shall, in all respects, be governed by the laws of the state in which the Facility is located applicable to agreements executed and to be wholly performed within such state.  Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but the provision of this Lease which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law without invalidating or affecting the remaining provisions of this Lease.

29.10   Each of the parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder and to carry out the intent of the parties hereto.

29.11   No amendment, change or modification of this document shall be valid unless in writing and signed by all of the parties hereto.

29.12   All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their successors except as provided in Article 17.

29.13   This document may be executed in one or more separate counterparts, each of which, when so executed, shall be deemed to be an original.  Such counterparts shall together constitute and be one and the same instrument.

29.14   The captions appearing at the commencement of the articles hereof are descriptive only and for convenience in reference.  Should there be any conflict between any such caption and the article, the article and not such caption shall control and govern in the construction of this document.

29.15   As long as Tenant is not in default of any of the terms, covenants and conditions of this Lease, Landlord covenants that Tenant, during the term hereof, shall have the quiet use and enjoyment of the Facility.

29.16   In the event that this Lease or any other financial obligation owed at present or in the future by Tenant to Landlord shall have been or will be guaranteed, such guaranty (the "Guaranty") shall be in the form attached hereto and shall be delivered to Landlord concurrently with the execution and delivery of this Lease by Tenant.  Any guaranty executed concurrently herewith or subsequent to the date hereof shall be deemed a material part of the consideration for Landlord's execution of this Lease.  In the event that any guarantor under the Guaranty is or becomes bankrupt or insolvent, makes an assignment for the benefit of creditors, or institutes or is the subject of any proceeding under the Bankruptcy Act or other similar law for the protection of creditors (or, if the guarantor is a partnership or consists of more than one person or entity, if any partner or

the partnership or other such person or entity is or becomes bankrupt or insolvent, institutes any such proceeding, or makes an assignment for the benefit of creditors), then Landlord shall have the option to terminate this Lease upon thirty (30) days written notice unless Tenant, within such thirty-day period, provides Landlord with either (1) a substitute or additional guarantor satisfactory to Landlord and Landlord's Lender (s), or (2) adequate assurance of the performance of each and every obligation of Tenant hereunder, satisfactory to Landlord and Landlord's Lender.

29.17   In the event that Tenant is not an individuals, the persons executing this Lease on behalf of Tenant represent and warrant to Landlord that (1) if Tenant is a partnership, Tenant's partnership agreement authorizes such persons to execute this Lease on behalf of Tenant, and (2) if Tenant is a corporation, such persons are executing this Lease pursuant to a resolution of Tenant's board of directors.  Concurrently with Tenant's execution of this Lease, Tenant shall deliver to Landlord a copy of Tenant's partnership agreement, or statement of partnership, or certificate of limited partnership, or certified copy of a board of directors resolution, as the case may be, confirming the foregoing authority.

29.18 Whenever under any provision of this Lease or any exhibit thereto, Tenant shall be obligated to make any payment or expenditure, or to do any act or thing, or to incur any liability whatsoever, and Tenant fails, refuses or neglects to perform as herein provided, Landlord shall be entitled but shall not be obligated to make such payment or expenditure, or do any such act or thing, or to incur any such liability, all on behalf of and at the cost and for the account of Tenant, together with interest at the maximum rate of interest permitted by law, or if no maximum rate then applies, at the rate of 18% per annum.

[SIGNATURE PAGE FOLLOWS]

SIGNATURE PAGE FOR LEASE OF SPRING SEASON OF AUSTIN DATED AS OF
FEBRUARY _16_, 2000 BETWEEN PRAIRIE EQUITIES, LTD. (LANDLORD) AND
SPRING SEASON OF AUSTIN, INC. (TENANT)

"Landlord"

Prairie Equities, Ltd.,
a New Jersey limited partnership

Date:
By:
Printed: Barry Lieberman
Its: General Partner

Landlord's Notice Address: Prairie Equities, Ltd.
c/o Barry Lieberman, Esq.
P.O. Box 7718
Wilton, CT 06897
Fax: (203) 454-4480

cc:  Robert Murray, Esq.
Diserio, Martin, O'Connor, et. al.
1 Atlantic Street
Stamford, CT 06901


"Tenant"

Spring Season of Austin, Inc.,
a Texas corporation

Date: 2/16/00
By: Larry May
Printed:  Larry May
Its:


Tenant's Notice Address:    Mr. Larry May
Spring Season of Austin, Inc.
3101 Govalle
Austin, TX 78702
Fax:    (512) 928-9366

40

TOTAL P.02

# EXHIBIT "B"

# SUBLEASE AGREEMENT

This Sublease Agreement ("Sublease") is made as of February 1, 2003 by and between XNH of Dallas, Inc., ("Sublessor") and Hc Healthcare Investors, Inc., ("Sublessee"), who agree as follows:

# R E C I T A L S

A.  Sublessor has leased certain premises, located in Travis County, Austin, Texas (the "Demised Premises") as identified in, and pursuant to, the terms and conditions of that certain Lease Agreement between Prairie Equities, LTD., ("Lessor") and Sublessor dated February 16, 2000.

B.  Sublessor desires to sublease to Sublessee, and Sublessee desires to sublease from Sublessor the Demised Premises pursuant to the terms and provisions of this Sublease. Sublessee is experienced in the management and operation of Rehabilitation Centers. Sublessee desires to lease the premises and the furniture, fixtures and equipment therein from Sublessor pursuant to the provisions of this Lease, for the purpose of operating a long-term care facility.

C.  Sublessor represents to Sublessee that Sublessor has all necessary power and authority to enter into this Sublease, and that, to the best of Sublessor's knowledge, the Lease is in effect as of the date of this Sublease. Sublessor represents that all consents, approvals and waivers of rights of first refusal to this Sublease, if any, as required by the Lease, will be obtained.

D.  If Sublessor receives any notices in the future from Lessor regarding any matter affecting the Sublease or the Lease, Sublessor agrees that it shall forward as promptly as possible copies of such notices to Sublessee.

NOW, THEREFORE, the parties agree as follows:

I.

*Sublease.*  Sublessor and Sublessee acknowledge that this Sublease is a sublease subject and subordinate to the Lease. Sublessee represents that it has read, and is familiar with the terms and provisions of the Lease, and Sublease agrees to comply, with the terms, provisions and covenants of the Lease relating to the obligations of Sublessor in the Lease, as fully as if Sublessee were the Tenant therein. Sublessee shall neither do, nor permit to be done by Sublessee's agents or employees anything which could cause a default in the Lease beyond any applicable notice and opportunity to cure which could

1

result in imminent termination of thereof, or cause the Lease to be terminated or forfeited by reason of any right of termination or forfeiture reserved or vested in the Lessor. Effective as of March 1, 2003, Sublessee shall assume the duties and obligations of Sublessor under the Lease, and Sublessee shall for any matters arising from and after March 1, 2003, indemnify and hold Sublessor harmless from, and against, all claims, demands, causes of action, and liabilities of any kind whatsoever, including reasonable attorney's fees, by reason of any breach, or default on the part of the Sublessee by reason of which the Lease may be terminated, or forfeited, or for which Sublessor may become liable for damages to Lessor, or any third parties. It is expressly agreed and understood that any such default by Sublessee in the Lease shall constitute a default hereunder. In the event of default by Sublessee under the Lease or this Sublease and if Sublessee fails to cure said default within the time period and method prescribed in the Lease, Sublessor shall have the right to enforce all of the remedies of the Lease against the Sublessee as if Sublessor were the Lessor. Even though Sublessee shall assume the duties and obligations of Sublessor under the Lease, Sublessor agrees that it shall indemnify and hold Sublessee harmless from, and against, all claims, demands, causes of action, and liabilities of any kind whatsoever, including reasonable attorney's fees, by reason of any breach or default on the part of Sublessor prior to March 1, 2003, by reason of which the Lease may be terminated, or forfeited, or for which Sublessee may become liable for damages to Lessor, or any third parties.

II.

*Performance by Lessor.* Sublessee shall be entitled to all benefits and services in connection with its occupancy of the Demised Premises to which Sublessor is entitled pursuant to the terms and provisions of the Lease; provided, however, Sublessor shall not be liable to Sublessee for failure of the Lessor to furnish such services, or to comply with any or all of Lessor's obligations or provisions of the Lease required to fulfill. Sublessee acknowledges and understands that in instances where either the Lessor is required to perform any act under the Lease, in no event shall Sublessor be liable or responsible to Sublessee for the failure of the Lessor to perform its obligations thereunder. Notwithstanding the foregoing, Sublessor acknowledges and agrees that Sublessee shall have the right to exercise the rights of Sublessor under the Lease to enforce the obligations of Lessor thereunder, and Sublessor agrees to cooperate with Sublessee to the fullest extent possible in connection with the enforcement of the subject obligations of Lessor.

2

## III.

*Term.* This Sublease shall be for a term commencing on March 1, 2003 and shall end commensurate with the end of the Lease, whether through expiration of the Lease term, or as otherwise provided under the Lease, or this Sublease.

## IV.

*Rent.* Sublessee shall pay directly to Sublessor on or before the first day of each month the rental payments as outlined in the original Lease.

## V.

*Assignment and Subletting.* Sublessee shall have no right to assign, or sublet, the Demised Premises, or Sublessee's interest in this Sublease, without prior written consent of Sublessor, which consent shall not be unreasonably withheld, and prior written consent of Lessor under the terms set forth in the Lease.

## VI.

*Alterations and Improvements.* Except as permitted in the Lease, Sublessee shall have no right to make any changes, alterations or improvements to the Demised Premises without the prior written consent of Sublessor, which consent shall not be unreasonably withheld.

## VII.

*Terms.* Terms used herein, and not otherwise defined, shall have the meanings as set forth in the Lease.

## VIII.

*Conflicts with Lease.* Whenever the covenants, terms or conditions of the Lease and this Sublease are in conflict, the terms of this Sublease shall control as between Sublessee and Sublessor.

## IX.

*Notices.* Notices or communication required or permitted to be given under this Sublease shall be delivered or given to the respective parties by registered or certified

3

mail, return receipt requested, at the following addresses, unless a party designated otherwise in writing:

| To Sublessor: | To Sublessee: |
|---|---|
| XNH of Dallas, Inc. | Hc Healthcare, Inc. |
| Attn: Legal Department | Attn: Legal Department |
| 3532 Bevann Drive | 7610 N. Stemmons Frwy, Ste 500 |
| Farmers Branch, Texas 75234 | Dallas, Texas 75247 |

Notices not mailed pursuant to this paragraph shall be deemed to be given as of three (3) days after the date of mailing. Notices delivered in person shall be deemed given at the time of receipt.

## X.

*Governing Law.* This Sublease shall be construed under and in accordance with the law of the State of Texas, and all obligations of the parties created hereunder are performable in Hays County, Texas.

*Severability.* In case any one or more of the provisions contained in this Sublease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision thereof and this Sublease shall be construed as if such invalid, illegal or unenforceable provision had never contained herein.

*Counterparts.* This Sublease may be executed in any number of counterparts, and each of such counterparts shall for all purposes be deemed to be an original.

*Attorney's Fees.* In the event of any litigation in relation to this Sublease, the unsuccessful party, in any litigation the finality of which is not subject to appeal, in addition to all other sums that either party may be called on to pay, shall be required to pay a reasonable sum for the successful party's attorney's fees.

*Parties Bound.* This Sublease shall be binding upon and, where allowed pursuant hereto, inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

*Entire Agreement.* This instrument and the Agreement to Sublease constitutes the sole and only agreement of the parties hereto relating to the subject matter hereof and correctly sets forth the rights, duties, and obligations of each to the other as of its date. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Sublease are of no force or effect.

*Memorandum of Sublease.* Each of the parties to this Sublease agrees to execute a Memorandum of Sublease, in proper recordable form, promptly upon the request of the other party.

*Enforcement of Lease by Landlord.* Sublessee expressly assumes and agrees to perform all of the obligations, covenants and conditions set forth in the Lease, and that Lessor is a creditor-beneficiary of this Sublease. Lessor shall have the right to enforce all if the provisions of the Lease directly against the Sublessee and/or Sublessor, at the Option of Lessor.

IN WITNESS WHEREOF, the Sublease has been executed by the parties as of the date first set forth above.

SUBLESSOR:                                          SUBLESSEE:

XNH OF DALLAS, INC.                                 HC HEALTHCARE INVESTORS, INC.


By: _____                        By: _____
Name: Jim McDonald                                  Name: Robert Burroughs
Title:  Director                                    Title: President

5

# EXHIBIT "C"



22917 PACIFIC COAST HIGHWAY
SUITE 350
MALIBU, CALIFORNIA 90265
MAIN:  805.981.8655
          310.455.6010
FAX:    805.981.8663

**Legal Department**
Telephone:  (805) 981-3614
Facsimile:   (805) 981-3616

November 25, 2003

*Via Facsimile and Federal Express*

Spring Season of Austin, Inc.
1401 A Kelly Boulevard
Carrollton, Texas 75006

Attention:  Gary R. Trebert

## NOTICE TO PAY RENT DIRECTLY TO LENDER

Re:    *Loan Agreement dated December 19, 1997 ("Loan Agreement") by and*
       *between LTC Properties, Inc., as lender ("LTC") and Prairie Equities,*
       *Ltd., as borrower ("Borrower") regarding the nursing home located at*
       *3101 Govalle Avenue, Austin, Texas ("Facility")*

Dear Mr. Trebert:

       An Event of Default (as defined in the Loan Agreement) has occurred under the
Loan Agreement.  A copy of LTC's letter of even date herewith addressed to Borrower
describing the Event of Default is enclosed for your reference.  Pursuant to the Article C5
of the Deed of Trust and Fixtures Financing Statement recorded on December 23, 1997 in
Book 13087 at Page 1233 of the Official Records of Travis County, Texas ("**Deed of
Trust**"), among other provisions of the Deed of Trust and Loan Agreement, you are
hereby instructed to direct all future rent payments and all other payments due Borrower
for the Facility directly to LTC.

       Unless and until you receive further written instructions from LTC to the
contrary, please direct all such payments to LTC Properties, Inc., 22917 Pacific Coast
Highway, Suite 350, Malibu, California 90265; Attention; Alex J. Chavez.  Alternatively,
you may wire funds in accordance with the wiring instructions enclosed.

                      Very truly yours,

                      *Wendy L. Simpson*

                      Wendy L. Simpson
                      Vice Chairman and Chief Financial Officer

WLS:jg
Enclosures
cc:   Andre C. Dimitriadis (w/out enclosures)
      Barry F. Lieberman (w/out enclosures)
      Robert E. Murray, Esq. (w/out enclosures)

L:\LTC\Lic345\Notice to Tenant 11-25-03.doc

**OVERNIGHT SERVICE**
Harris Trust and Savings Bank
Attn: Remit Processing Div.
7th Floor, LOCKBOX # 74742
311 W. Monroe St.
Chicago, IL  60694

**WIRING INSTRUCTIONS**
Harris Trust and Savings Bank

ABA:  071000288

Beneficiary:  LTC Properties, Inc.

Account No:  317-4554

OBI:  Prairie Equities Loan  #1210



22917 Pacific Coast Highway
Suite 350
Malibu, California 90265
Main:    805.981.8655
          310. 455. 6010
Fax:    805. 981. 8663

Legal Department
Telephone:  (805) 981-3614
Facsimile:   (805) 981-3616

November 25, 2003

*Via Facsimile and Certified Mail, Return Receipt Requested*

Prairie Equities, Ltd.
P.O. Box 7718
Wilton, Connecticut  06897

Attention:  Barry F. Lieberman

## NOTICE OF EVENT OF DEFAULT – FAILURE TO MAKE PAYMENT

## EVENT OF DEFAULT – FAILURE TO PAY DELINQUENT TAXES

> Re:    *Loan Agreement dated December 19, 1997 ("Loan Agreement") by and between LTC Properties, Inc., as Lender ("LTC"), and Prairie Equities, Ltd., as Borrower ("Borrower") regarding that certain nursing home located at 3101 Govalle Avenue, Austin, Texas*

Dear Mr. Lieberman:

We are writing with respect to the delinquent status of the loan.  As of the date of this letter, LTC has not received the loan payments due October 15, 2003 and November 15, 2003. Borrower's failure to timely make such loan payments has resulted in an Event of Default under the Loan Documents (as defined in the Loan Agreement).

In addition to the foregoing, Borrower has failed to pay real and personal property taxes, which amounts are now delinquent, and all of which Borrower is obligated to pay under the Loan Documents.  Borrower's failure to pay the real and personal property taxes constitutes an Event of Default under the Loan Documents including, without limitation, Section 11.2(d) of the Loan Agreement, and Article II, Subsection B of the Deed of Trust (defined below).

The Loan is evidenced by, among other things, that certain Promissory Note Secured by Deed of Trust dated December 23, 1997 in the original principal amount of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) made by Borrower in favor of LTC (the

**LTC PROPERTIES, C.**

Barry F. Lieberman
November 25, 2003
Page 2

"Note"), and secured by, among other things, (i) that certain Deed of Trust dated as of December 19, 1997 made by Borrower for the benefit of LTC and recorded on December 23, 1997 in Book 13087, Pages 1233-1265 of the Official Records of Travis County, Texas (the "**Deed of Trust**"), and (ii) that certain Assignment of Leases and Licenses, Rents, Issues and Profits dated December 19, 1997 (the "**Assignment of Rents**").  The Loan Agreement, Note, Deed, Assignment of Rents, and all other documents by or between Borrower and/or LTC, as the same may be amended from time to time, shall be referred to as the "**Loan Documents.**"

Very truly yours,

Wendy L. Simpson
Vice Chairman and Chief Financial Officer

WLS:jg

cc:  Andre C. Dimitriadis
     Robert E. Murray, Esq. (via facsimile and FedEx)
     Gary R. Trebert, Esq. (via facsimile and FedEx)

# EXHIBIT "D"

**CARRINGTON**
**COLEMAN**
**SLOMAN &**
**BLUMENTHAL L.L.P.**   200 CRESCENT COURT• SUITE 1500• DALLAS, TEXAS 75201-1848• TEL 214.855.3000• FAX 214.855.1333
ATTORNEYS AT LAW

November 26, 2003

DAVID G. DRUMM
TEL. 214 855 3002
FAX. 214 758 3732
E-MAIL: DDRUMM@CCSB.COM

<u>**VIA CERTIFIED MAIL, RRR**</u>

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
1121 North Seventh
Herrin, IL  62948

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
**c/o Flexford, Inc.**
410 E. Hillside Road, Suite 472
Laredo, TX 78041

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
3101 Govalle Avenue
Austin, TX 78702

Re:     3101 Govalle Avenue, Austin, Texas

Gentlemen:

We represent and write on behalf of Prairie Equities, Ltd., the owner of the facility at 3101 Govalle Avenue, Austin, Texas  77056 (the "Premises").  As you know, HC Healthcare, Inc., commenced operations on the Premises on or around March 1, 2003, following the rejection of the previous lease by XNH of Dallas, Inc. (formerly "Spring Seasons of Austin, Inc.") as debtor in possession in Chapter 11 Case No. 03-30986-SAF-11 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.  HC Healthcare, Inc., was allowed to begin operations on the expectation that a mutually agreeable lease agreement would be executed by and between Prairie Equities, Ltd., and HC Healthcare, Inc.  The lease negotiations did not result in a mutually acceptable lease document, and HC Healthcare, Inc., has continued to occupy the property under an oral month-to-month lease, paying rent monthly in the amount of $26,267.17.

The rental payment under the oral month-to-month arrangement in the amount of $26,269.17 due on November 1, 2003, has not been paid and is delinquent.  You are hereby provided with five days' written notice to make such payment, failing which Prairie Equities, Ltd., will declare the month-to-month lease terminated and seek to recover possession of the Premises.

552753.2

C Healthcare, Inc., a Texas corporation
ovember 26, 2003
ige 2

Further, and without regard to the payment of the month-to-month rent due on November 1, 2003, Prairie Equities, Ltd., hereby provides notice of termination of the month-to-month tenancy effective as of December 31, 2003.

Sincerely,

David G. Drumm

DGD:jak

cc:     Barry Lieberman (via e-mail only)
        Ed Reisdorf (via e-mail only)
        Kelly McDonald (via e-mail only)
        Gary Trebert (via CM/RRR)

# EXHIBIT "E"

No. _____

| | | |
|---|---|---|
| **PRAIRIE EQUITIES, Ltd.,** | § | **IN THE JUSTICE COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **HC Healthcare Investors, Inc.,** | § | |
| | § | |
| *Defendant.* | § | **PRECINCT NO. 4** |

## COMPLAINT FOR FORCIBLE DETAINER

**TO THE HONORABLE COURT:**

Plaintiff Prairie Equities, Ltd. ("Plaintiff") complains of Defendant HC Healthcare Investors, Inc. d/b/a Redstone Nursing and Rehab Center ("Defendant"), and for cause of action states as follows:

1.      Plaintiff is Prairie Equities, Ltd., a New Jersey limited partnership with its principal office being located at PO Box 7718, Wilton, Connecticut 06897 and is qualified to do business in Texas.

2.      Defendant HC Healthcare Investors, Inc. d/b/a Redstone Nursing and Rehab Center is a Texas corporation, which may be served with process through its registered agent, Flexford, Inc. at 410 E. Hillside Road, Suite 472, Laredo, Texas 78041.   All other home and work addresses of Defendant that are known to Plaintiff are as follows:  1121 North Seventh, Herrin, Illinois 62948 and 3101 Govalle Avenue, Austin, Texas 78702 (the "Premises" defined in paragraph 3 below). Plaintiff knows of no other home or work addresses of Defendant in the county where the premises made the subject of this complaint are located.

3.     Plaintiff is the owner of certain real property located at 3101 Govalle Avenue, Austin, Texas 78702, previously known as Spring Season of Austin, and currently operating as Redstone Nursing and Rehab Center (the "Premises") as well as certain personal property (furniture, fixtures, equipment and inventory) located in the Premises (the "Personal Property"). The Premises and Personal Property are hereinafter collectively referred to as the "Facility."

4.     Defendant commenced operations on the Premises on or around March 1, 2003, following the rejection of the previous lease held by XNH of Dallas, Inc. (formerly known as "Spring Seasons of Austin, Inc.") as debtor in possession in Chapter 11 Case No. 03-30986-SAF-11 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

5.     Defendant was allowed to begin operations on the expectation that a mutually agreeable lease agreement would be executed by and between it and Prairie Equities, Ltd.  The lease negotiations did not result in a mutually acceptable lease document, and Defendant has continued to occupy the property under an oral month-to-month lease, paying rent monthly in the amount of $26,267.17.

6.     The rental payment under the oral month-to-month arrangement in the amount of $26,269.17 which was due on November 1, 2003 has not been paid and is delinquent.  Defendant was provided with five days' written notice by letter dated November 26, 2003 to make such payment, failing which Plaintiff would declare the month-to-month lease terminated and seek to recover possession of the Premises.   A true and correct copy of the November 26, 2003 notice is attached hereto as Exhibit A.

7.     The payment of the monthly rent installment due on November 1, 1993, under the current month-to-month lease, still remains unpaid, after the notice and opportunity to cure provided by the letter dated November 26, 2003. Defendant refuses to surrender possession of and is holding willfully and without force the Facility after defaulting on the oral month-to-month lease.

8.     Pursuant to Section 24.005 of the Texas Property Code, by letter dated December 2, 2003, a true and correct copy of which is attached hereto as Exhibit B, Plaintiff gave Defendant three (3) day written notice to vacate the Facility. Defendant despite this notice and demand, failed and refused and continues to fail and refuse to vacate the Facility.

WHEREFORE, Plaintiff Prairie Equities, Ltd. respectfully prays that Defendant HC Healthcare Investors, Inc. d/b/a Redstone Nursing and Rehab Center be cited to appear and answer herein, and upon trial, Plaintiff have judgment against Defendant for possession of the Facility and recover from Defendant all costs of Court, and Plaintiff receive any other relief to which Plaintiff shows itself justly entitled.

Respectfully Submitted,

Rebecca Kimmel
State Bar No. 24027113
CARRINGTON, COLEMAN, SLOMAN
   & BLUMENTHAL
200 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 855-3000
Fax: (214) 855-1333
**ATTORNEYS FOR PLAINTIFF
PRAIRIE EQUITIES, LTD.**

## VERIFICATION

BEFORE ME, the undersigned notary public, on this day personally appeared David G. Drumm, and after being first duly sworn, declared that he is an attorney and agent for the Plaintiff and is authorized to make this affidavit; that he has read the above Complaint for Forcible Detainer; and that the statements contained in the second and third sentences of paragraph 6 and the first sentence of paragraph 8 are within his personal knowledge and are true and correct.

_____
David Drumm

SUBSCRIBED AND SWORN TO before me on the 7th day of December, 2003, to certify which witness my hand and seal of office.

_____
Notary Public for the State of Texas
My Commission expires: _____

DANA LENNON
Notary Public
STATE OF TEXAS
My Comm. Expires 04-11-2005

**COMPLAINT FOR FORCIBLE DETAINER - Page 4**
554044.2

## VERIFICATION

BEFORE ME, the undersigned notary public, on this day personally appeared Barry Lieberman, and after being first duly sworn, declared that he is the general partner of Prairie Equities, Ltd., Plaintiff in this action, and is authorized to make this affidavit; that he has read the above Complaint for Forcible Detainer; and that the statements contained in paragraphs 1-8 are within his personal knowledge and are true and correct.



_____, g.p.
Barry Lieberman

SUBSCRIBED AND SWORN TO before me on the ___8___ day of December, 2003, to certify which witness my hand and seal of office.

MARILYN MEINERS
MY COMMISSION EXPIRES
January 26, 2008

_Marilyn Meiners_
Notary Public for the State of Texas
My Commission expires: _1/26/2008_

**COMPLAINT FOR FORCIBLE DETAINER - Page 5**
554044.2

**CARRINGTON**
**COLEMAN**
**SLOMAN &**
**BLUMENTHAL L.L.P.**    200 CRESCENT COURT • SUITE 1500 • DALLAS, TEXAS 75201-1848 • TEL 214.855.3000 • FAX 214.855.1333
ATTORNEYS AT LAW

November 26, 2003

DAVID G. DRUMM
TEL: 214.855.3032
FAX: 214.754.3732
E-MAIL: DDRUMM@CCSB.COM

<u>**VIA CERTIFIED MAIL, RRR**</u>

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
1121 North Seventh
Herrin, IL  62948

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
c/o Flexford, Inc.
410 E. Hillside Road, Suite 472
Laredo, TX 78041

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
3101 Govalle Avenue
Austin, TX 78702

Re:    3101 Govalle Avenue, Austin, Texas

Gentlemen:

We represent and write on behalf of Prairie Equities, Ltd., the owner of the facility at
3101 Govalle Avenue, Austin, Texas  77056 (the "Premises").  As you know,
HC Healthcare, Inc., commenced operations on the Premises on or around
March 1, 2003, following the rejection of the previous lease by XNH of Dallas, Inc.
(formerly "Spring Seasons of Austin, Inc.") as debtor in possession in Chapter 11
Case No. 03-30986-SAF-11 in the United States Bankruptcy Court for the Northern
District of Texas, Dallas Division.  HC Healthcare, Inc., was allowed to begin
operations on the expectation that a mutually agreeable lease agreement would be
executed by and between Prairie Equities, Ltd., and HC Healthcare, Inc.  The lease
negotiations did not result in a mutually acceptable lease document, and HC
Healthcare, Inc., has continued to occupy the property under an oral month-to-month
lease, paying rent monthly in the amount of $26,267.17.

The rental payment under the oral month-to-month arrangement in the amount of
$26,269.17 due on November 1, 2003, has not been paid and is delinquent.  You are
hereby provided with five days' written notice to make such payment, failing which
Prairie Equities, Ltd., will declare the month-to-month lease terminated and seek to
recover possession of the Premises.



552753.2

C Healthcare, Inc., a Texas corporation
ovember 26, 2003
ge 2

Further, and without regard to the payment of the month-to-month rent due on November 1, 2003, Prairie Equities, Ltd., hereby provides notice of termination of the month-to-month tenancy effective as of December 31, 2003.

Sincerely,

David G. Drumm

DGD:jak

cc:    Barry Lieberman (via e-mail only)
       Ed Reisdorf (via e-mail only)
       Kelly McDonald (via e-mail only)
       Gary Trebert (via CM/RRR)

**Certified Article Number**

7160 3901 9844 2409 7833

**SENDERS RECORD**

552753.2

7160 3901 9844 2409 9066

**TO:**

11/26/2003 a Texas corporation
HC Healthcare, Inc.,
d/b/a Redstone Nursing and Rehab Center
3101 Govalle Avenue
Austin, TX 78702

**SENDER:**   DGDrumm

**REFERENCE:**   Prairie re: Spring Seasons

PS Form 3800, June 2000

| RETURN RECEIPT SERVICE | Postage | |
|---|---|---|
| | Certified Fee | 1.00 |
| | Return Receipt Fee | 1.00 |
| | Restricted Delivery | |
| | Total Postage & Fees | $ 2.00 |

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE
11/26/2003

---

7160 3901 9844 2409 9073

**TO:**

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
c/o Flexford, Inc.
410 E. Hillside Road, Suite 472
Laredo, TX 78041

**SENDER:**   DGDrumm

**REFERENCE:**   Prairie re: Spring Seasons

PS Form 3800, June 2000

| RETURN RECEIPT SERVICE | Postage | |
|---|---|---|
| | Certified Fee | 1.00 |
| | Return Receipt Fee | 1.00 |
| | Restricted Delivery | |
| | Total Postage & Fees | $ 2.00 |

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE
11/26/2003

---

7160 3901 9844 2409 9080

**TO:**

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
1121 North Seventh
Herrin, IL 62948

**SENDER:**   DGDrumm

**REFERENCE:**   Prairie re: Spring Seasons

PS Form 3800, June 2000

| RETURN RECEIPT SERVICE | Postage | |
|---|---|---|
| | Certified Fee | 1.00 |
| | Return Receipt Fee | 1.00 |
| | Restricted Delivery | |
| | Total Postage & Fees | $ 2.00 |

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE
11/26/2003

---

7160 3901 9844 2409 7833

**TO:**

Gary Trebert
1401 A Kelly
Carrolton, TX 75006

**SENDER:**   David Drumm (021533-0002)
Prairie Equities, Ltd./Spring

**REFERENCE:**   Austin, Inc.)

PS Form 3800, June 2000

| RETURN RECEIPT SERVICE | Postage | |
|---|---|---|
| | Certified Fee | 1.00 |
| | Return Receipt Fee | 1.00 |
| | Restricted Delivery | |
| | Total Postage & Fees | $ 2.00 |

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE
12/3/2003

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Del
                                         12-04

C. Signature
X _____    □ Ag
                         □ Ac
D. Is delivery address different from item 1?   □ Ye
   If YES, enter delivery address below:        □ N

7160 3901 9844 2409 7833

3. Service Type   CERTIFIED MAIL
4. Restricted Delivery? (Extra Fee)   □ Yes
1. Article Addressed to:

Gary Trebert
1401 A Kelly
Carrolton, TX  75006

12/3/2003

Prairie Equities, Ltd./Spring Seasons of Austin, Inc.)David Drumn

PS Form 3811, July 2001          Domestic Return Receipt

2. Article Number

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Del
ROSA  M. CHAVEZ                          11-28-0

C. Signature
X Rosa M Chavez          □ Ag
                         □ Ac
D. Is delivery address different from item 1?   □ Ye
   If YES, enter delivery address below:        □ N

7160 3901 9844 2409 9073

3. Service Type   CERTIFIED MAIL
4. Restricted Delivery? (Extra Fee)   □ Yes
1. Article Addressed to:

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
c/o Flexford, Inc.
410 E. Hillside Road, Suite 472
Laredo, TX 78041

11/26/2003

Prairie re: Spring Seasons                    DGDrum

PS Form 3811, July 2001          Domestic Return Receipt

2. Article Number

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Del
                                         12/1

C. Signature
X _____    □ A
                         □ A
D. Is delivery address different from item 1?   □ Y
   If YES, enter delivery address below:        □ N

7160 3901 9844 2409 9066

3. Service Type   CERTIFIED MAIL
4. Restricted Delivery? (Extra Fee)   □ Yes
1. Article Addressed to:

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
3101 Govalle Avenue
Austin, TX 78702

11/26/2003

Prairie re: Spring Seasons                    DGDrum

PS Form 3811, July 2001          Domestic Return Receipt



ARRINGTON
COLEMAN
COLOMAN &
BLUMENTHAL L.L.P.
ATTORNEYS AT LAW

RETURN RECEIPT REQUESTED

HC Healthcare Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Cen
North Seventh

ATTEMPTED
NOT KNOWN

NOV 20 05
TX

$4.42
U.S. POSTAGE

1ST NOTIC
2ND NOTIC
RETURN

**ARRINGTON**
**OLEMAN**
**LOMAN &**
**LUMENTHAL L.L.P.**       200 CRESCENT COURT • SUITE 1500 • DALLAS, TEXAS 75201-1848 • TEL 214.855.3000 • FAX 214.855.1233
ATTORNEYS AT LAW

AVID G. DRUMM
EL: 214.855.3032
:X: 214.758.3752
MAIL: DDRUMM@CCSB.COM

December 2, 2003

<u>**VIA CERTIFIED MAIL, RRR**</u>

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
1121 North Seventh
Herrin, IL 62948

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
c/o Flexford, Inc.
410 E. Hillside Road, Suite 472
Laredo, TX 78041

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
3101 Govalle Avenue
Austin, TX 78702

> Certified Article Number
> 7160 3901 9844 2409 7802
> SENDERS RECORD

> Certified Article Number
> 7160 3901 9844 2409 7819
> SENDERS RECORD

> Certified Article Number
> 7160 3901 9844 2409 7826
> SENDERS RECORD

Re:    3101 Govalle Avenue, Austin, Texas

Gentlemen:

The payment of the monthly rent installment due on November 1, 1993, under the current month-to-month lease still remains unpaid, after the notice and opportunity to cure provided by our previous letter dated November 26, 2003. Accordingly, Prairie Equities, Ltd., hereby provides you with three (3) days written notice to vacate the premises pursuant to Section 24.005(a) of the Texas Property Code, preparatory to filing a forcible detainer suit.

Sincerely,

David G. Drumm

DGD:drl

cc:    Barry Lieberman (via e-mail only)
       Ed Reisdorf (via e-mail only)
       Kelly McDonald (via e-mail only)
       Gary Trebert (via Certified Mail, RRR)

**EXHIBIT B**

> Certified Article Number
> 7160 3901 9844 2409 7840
> SENDERS RECORD

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)  B. Date of Deli
12-6U

C. Signature
x Do Cor    ☐ Ag
            ☐ Ad

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

7160 3901 9844 2409 7840

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)   ☐ Yes

1. Article Addressed to:

Gary Trebert
1401 A Kelly
Carrolton, TX 75006

12/3/2003

Prairie Equities, Ltd./Spring Seasons of Austin, Inc.)David Drumm

PS Form 3811, July 2001          Domestic Return Receipt

2. Article Number

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)  B. Date of Deli
Erica maya    12-9~

C. Signature
x Erica maya    ☐ Ag
               ☐ Ad

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

7160 3901 9844 2409 7819

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)   ☐ Yes

1. Article Addressed to:

HC Healthcare, Inc., a Texas corporation
d/b/a Redstone Nursing and Rehab Center
c/o Flexiford, Inc.
410 E. Hillside Rd., Suite 472
Laredo, TX 78041

12/2/2003

Prairie Equities/Spring Seasons    David Drumm (021533-0002)
PS Form 3811, July 2001          Domestic Return Receipt

2. Article Number

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)  B. Date of Deliv
MJ Limian    12/9/

C. Signature
x    ☐ Age
     ☐ Add

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

7160 3901 9844 2409 7826

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)   ☐ Yes

1. Article Addressed to:

HC Healthcare, Inc., a Texas corporation
d/b/a/Redstone Nursing and Rehab Center
3101 Govalle Avenue
Austin, TX 78702

12/2/2003

Prairie Equities/Spring Seasons    David Drumm (021533-0002)
PS Form 3811, July 2001          Domestic Return Receipt